IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CASE NO.: 1:26-cv-03988

EDWARD ROMAN BADALIAN,
Address filed under seal;
ANDREW WILLIAM GRISWOLD,
Address filed under seal;
DANIEL JAY HERENDEEN,
Address filed under seal;
CHRISTOPHER MICHAEL KELLY,
Address filed under seal;
RICHARD MEAD MARKEY,
Address filed under seal;
FELIPE ANTONIO MARTINEZ,
Address filed under seal;
ANTHONY MICHAEL PUMA,
Address filed under seal;
STEPHEN CHASE RANDOLPH,
Address filed under seal;
KIM MICHAEL SORGENTE,
Address filed under seal;
ANDREW JAMES WILLIAMS,
Address filed under seal;

Plaintiffs,

v.

UNITED STATES OF AMERICA,
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Defendant.

_________________________________/

**COMPLAINT PURSUANT TO THE FEDERAL TORT CLAIMS ACT**

The Plaintiffs, Edward Roman Badalian, Andrew William Griswold, Daniel Jay Herendeen, Christopher Michael Kelly, Richard Mead Markey, Felipe Antonio Martinez, Anthony Michael Puma, Stephen Chase Randolph, Kim Michael Sorgente, and Andrew James Williams

(hereinafter collectively referred to as the "J6ers"), by and through their undersigned counsel, hereby file their Complaint against the Defendant, the United States of America, and allege as follows:

## Jurisdiction and Venue

1. This Court has subject-matter jurisdiction pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (FTCA) and 28 U.S.C. § 1331 (federal question).

2. Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1402(b) because most of the acts and omissions giving rise individually to each of the Plaintiffs' claims occurred in this District, where the supposed infringements occurred at the Capitol and prosecutions were initiated, investigated, and litigated.

## Exhaustion of Administrative Remedies

3. Pursuant to 28 U.S.C. § 2675(a), the J6ers timely filed administrative claims with the United States, the Federal Bureau of Investigation or other appropriate federal agencies, and they have fully exhausted all administrative remedies required by the Federal Tort Claims Act ("FTCA"). More than six months have elapsed since the presentment of the SF-95 claim forms without final disposition by the agencies, or the claims were denied.

## Parties

***Plaintiffs***

4. Edward Roman Badalian is a citizen of the State of California.

5. Andrew William Griswold is a citizen of the State of Florida.

6. Daniel Jay Herendeen is a citizen of the State of Tennessee.

7. Christopher Michael Kelly is a citizen of the State of Florida.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

8. Richard Mead Markey is a citizen of the State of Connecticut.

9. Felipe Antonio Martinez is a citizen of the State of California.

10. Anthony Michael Puma is a citizen of the State of Michigan.

11. Stephen Chase Randolph is a citizen of the State of Texas.

12. Kim Michael Sorgente is a citizen of the State of California.

13. Andrew James Williams is a citizen of the State of Alabama.

***Defendant***

14. The Defendant, United States of America, is sued under the FTCA for the tortious acts and omissions of its employees, including Capitol Police, Washington, D.C., Metropolitan Police, Attorney General Merrick Garland, U.S. Attorney Matthew Graves, FBI Director Christopher Wray, and Assistant U.S. Attorneys Ashley Akers, Victoria Sheets, and Candice Wong, acting within the scope of their federal employment.

## **The Biggest Crime in American History**

***Prefatory Statement***

15. The J6ers are patriotic American citizens who witnessed, as did most of the nation, the reporting on the Presidential Election of 2020 (hereinafter referred to as the "Election"). As is explained below, each of the Plaintiffs knew and understood by what they saw and learned that the Election had been rigged and they were concerned that their country was being wrongfully taken.

16. On January 6, 2021 (hereinafter referred to also as "January 6" or "J6"), the protesters who were in attendance on the Capitol grounds and/or in the Capitol building (hereinafter referred to as the "J6ers") innocently traveled to Washington, D.C., as they were

anxious to learn whatever they could and to connect with like-minded patriots who had the same concerns and who were there to peacefully protest the rigging of the Election. For almost all of the J6ers, their involvement was peaceful as they stood in groups, praying and/or singing patriotic songs such as God Bless America.

17. Unfortunately, the events which started peacefully turned into mayhem. On the West side of the Capitol Building, Metropolitan Police began to bombard the crowds with teargas and percussion grenades. Ultimately, they used SG gas, and everything went from bad to worse, resulting in four deaths and other injuries to J6ers, while the Capitol Police and the Metropolitan Police suffered only a few minor injuries, such as an officer's broken finger.

18. J6ers were waved into the Capitol Building by the Capitol Police, and for the most part, they acted peacefully.

19. Yet, after the events of the day, false news was circulated of 5 deaths of police officers and accusations that the J6ers were insurrectionists. Ultimately, the Garland DOJ prosecuted the J6ers in dreadful ways, in conjunction with the District Court judges and magistrate judges who worked together to wrongfully imprison and wrongfully try and sentence innocent J6ers and others.

20. In this regard, only one Magistrate Judge showed any connection with those responsible for the rigging of the Election. Other than that one individual, who may or may not have influenced the rest of the D.C. federal bench, there is no evidence that the judges of the court consciously knew that they were aiding and abetting the enemy. The wrongdoing done by the bench was probably far more innocent than many suspect, as it was the nature and purpose of the occurrences on January 6.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

21. What the federal bench and the rest of the American people did not know was that the events which occurred on January 6 did not begin on that date. In fact, the breaking of the windows of the Capitol Building and the inducing of the J6ers to enter the grounds and the building had been planned long before Election Day.

22. To understand what occurred, one must zoom out to the proverbial 30,000 feet and understand the historical and global context of what occurred. The population of the United States is approximately 4% of the world's population, and yet it has approximately 27% of the global GNP. Following World War II, the United States has been the most powerful economy and military force on Earth, and remains so to this day, despite foreign and domestic influences which are intended and determined to destroy the United States.

23. For many decades, the government of the United States encouraged endless wars, the export of our manufacturing base, and movement toward global governance.

24. As a result, foreign powers, especially China, prospered and fundamental institutions of the United States became infiltrated by both foreign interests and domestic actors whose interests aligned with global governance.

25. Over time, in the last decades, global interests have infiltrated and become more common and more involved in different governmental agencies and normal American life, including the American educational system from K-1 through higher learning; the American traditional media; most of social media; aspects of big business; and certain churches.

26. Before Donald J. Trump came to office, although there were differences between the American political parties, each subscribed to these policies, supporting, for example, the U.N., W.H.O., the World Economic Forum, and globalism. Donald J. Trump presented a fundamental



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

change to "America First" and to "Make America Great Again," or "MAGA," and a majority of Americans responded to the call to conservatism and nationalism.

27. In effect, Donald J. Trump emerged to control the Republican Party which had its base disgorged, leaving that globalist minority known as "Republicans in Name Only" or "RINOs" as a minority. Meanwhile, the Democrat Party held the banner of globalism to the extent that its policies were extreme. For example, it embraced the U.N., W.H.O., the World Economic Forum, China, and open borders. In fact, it encouraged virtues of utopia, where all people are equal and programs such as being Woke, or embracing "Diversity, Equity, and Inclusion," or "DEI," were pitted against conservatism and making America First.

28. As a result of the dichotomy between the ways of Donald J. Trump and the Globalists, the nation became emotionally divided where hatred toward Donald J. Trump actually was given an unofficial but well-known psychological designation in the MAGA counterculture of "Trump Derangement Syndrome," and while the conservatives are constrained by beliefs which require adherence to the doctrines of religion, the U.S. Constitution, and the rule of law, the Globalists, though greatly outnumbered, are not so constrained.

29. As Donald J. Trump was consolidating his base in the Republican Party, the Globalists rose in influence and control of the Democrat Party, giving them more than a base. It gives them a means of gaining and taking control of the United States.

30. At this juncture, the Globalists have not only infiltrated the Democrat Party, but they have infiltrated all aspects of government including members of our judiciary and the U.S. Department of Justice, and they are active.

31. While the social tide was changing in the United States, foreign states, primarily China, Venezuela, and Serbia, together with anti-American interests, such as George Soros, Bill



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Gates, and the World Economic Forum, encouraged their efforts to cause confusion among Americans which played into the divergence of values. DEI became the Woke philosophy with an appearance of legitimacy for ideas which sometimes defied common sense. For instance, Boards of Education in various counties permitted and sometimes encouraged young children who were normal and capable of being influenced to believe that they were of the opposite sex. This liberalization grew to the point where male-to-female transitioners would participate in women's sports to break all kinds of records.

32. As another example of the incompatibility between the Left and the Right, whereas the Conservatives favor equal opportunities for all races, the Globalists seek repentance from Caucasian males for bad acts supposedly committed by some of their ancestors.

33. In 2016, Donald J. Trump won the Presidential race. Instantaneously, false narratives were made and given credence, such as the "Russia Collusion" accusations against President Trump. Some Globalist FBI agents considered a plan to have a special prosecutor appointed to be an "insurance policy." Mueller, who spent $30 million investigating, came up empty. Instead of unearthing Russian collusion and other crimes, Donald J. Trump was proven to have been law-abiding.

34. However, the 2016 election of Donald J. Trump did lead to a great deal of social unrest and during the four years of his first term, a large percentage of Americans became susceptible to believing in positions contrary to the American way. These people formed a base in our society which foreign interests were able to wittingly and unwittingly enlist.

35. Worse were systems by those who governed China, Venezuela, Serbia, and others who developed machines with programs by which the outcome of the Election could be manipulated and determined.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

36. Before 2020, the election equipment had been partially utilized, but in 2020, the foreign governments and all of their accomplices were set to rig the Presidential Election, and that is exactly what occurred. The election was rigged, and all who participated directly were guilty of conspiring to overthrow the government of the United States by force, which was sedition pursuant to 18 U.S.C. § 2384; which was also the inciting, assisting, and engaging in insurrection against the authority of the laws of the United States, a conspiracy to commit insurrection pursuant to 18 U.S.C. § 2383; which was also adhering to the enemies of the United States and giving them aid and comfort by participating in the takeover of the United States to commit conspiracy to commit treason pursuant to 18 U.S.C. § 2381.

37. In the case at bar, the members of preexisting groups—such as the D.C. Metropolitan Police, the Capitol Police, the lawyers who were part of the DOJ, the prison officials, and others—had a general meeting of the minds, worked together for the common purpose of defeating the United States of America or covering up the rigging of the 2020 Presidential Election, and were guilty of sedition, insurrection, and treason.

38. As the enemies of the United States who participated in the massive foreign interference in the United States Presidential Election had extensively infiltrated American society, judges, attorneys, and other groups perhaps thought that they were doing a good thing by attempting to defeat the interests of the United States, but they were doing wrong, and acting against the interests of the government of the United States, which at the time was led by President Donald J. Trump.

***The Rigged Presidential Election of 2020***

39. This Complaint concerns a part of the planning, execution, and follow-up of the most widespread, most pervasive, most deep-seated, and, overall, the greatest anti-American

conspiracy in history by American citizens and other domestic participants, who worked cohesively for the best interests of foreign powers and to take over the government of the United States, not through overt military invasion, but rather by the insidious and surreptitious infiltration of the election system of the United States. The Americans who participated in this planning and execution of the planned events were participating in nothing less than a conspiracy to commit sedition, insurrection, and treason.

**The Development of the Enemy's Capability**

40. Following World War II, the United States became an avid opponent of tyranny and Communism, contrary to other nations including China and Venezuela, which had become adversaries to the United States before the turn of the 21st century.

41. In the early 2000s, the leader of Venezuela, Hugo Chavez, developed coding for voting machines by programmers located in Serbia which could control the results of elections which were tabulated on machines made in China for the companies of Sequoia and Smartmatic.

42. In the year 2000, in Florida, ballots for the Presidential Election used chads which ultimately led to a failure of public confidence in punch voting machines and a substitute was in demand.

43. Meanwhile, the President of Venezuela, Hugo Chavez, was extremely unpopular and had been developing voting equipment which could be programed to cause the tabulation of the votes to be manipulated. In August of 2004, voting equipment was implemented in Venezuela for a recall election of President Chavez. Due to the machines, instead of being removed from office, Chavez won with 58% of the vote. By 2006, the machines programmed by Serbians for the Venezuelans had made their way to the United States where they were implemented for the 2008 Democrat primaries.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

44. Over the next 14 years, the corrupted election equipment was sold to county clerks and other election officials throughout the United States. Contrary to what the companies, Smartmatic USA Corporation, Dominion Voting Systems, ES&S, and others, said, the machines were not "air gapped," meaning unable to communicate with other computers. In fact, the ES&S tabulators actually had phone chips, as cell phones do, on the motherboards, and Dominion equipment was connected through VPN connections.

45. After Donald J. Trump won the Presidential Election in 2016, and it was clear he was going to change the status quo in terms of ending perpetual wars and shifting power from those in the government who controlled decisions to the office of the President, deep state individuals, especially some in the Democrat Party, and foreign governments, including a number in the EU, Britain, and others, perpetrated a fraud on the American people accusing President Trump of collusion with Vladimir Putin. When that attack on the Trump government of the United States failed, accusation after accusation causing impeachment and criminal charges to be brought were all part of the plan to return the government to one more friendly and cooperative to the goals of China, the EU, and Great Britain.

46. Ultimately, the direction of the free world, in fact, the whole world, was to rest on the question of whether Donald J. Trump would be reelected in 2020. As it was obvious that Donald J. Trump would have trounced his opponent, Joseph Biden, who campaigned from his basement and had a rally where 6 cars showed up, it became necessary for the foreign actors and domestic insurgents to use all efforts to rig the 2020 Presidential Election.

47. As a result, in 2020, the United States witnessed the "Summer of Love," which was a plan to implement civil unrest in Left-wing cities, for which paid activists were employed.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

48. Moreover, in the autumn of 2019, a virus had been released from a laboratory in Wuhan, China. After the population of Wuhan was greatly infected, all commercial flights to all other cities in China from Wuhan were stopped. However, flights to the United States and Western Europe were encouraged. In this way, China intentionally attacked the United States with a biological weapon, knowing that it would cause massive deaths and a great change in the course of the 2020 U.S. Presidential Election.

49. As a result of the pandemic, states caused the rules to change, often illegally, and mail-in ballots were permitted to an extent which could change the results of the Election from ballot harvesting and other methods of cheating. The machines, though, had the power to determine the results of the elections by ginning up more votes than could ever be needed.

50. The rigging of the 2020 Presidential Election involved ballot harvesting and applying ballots in various races which were not provided by voters, either in person or by mail, but rather, were extra ballots prepared by criminals who put the ballots through the tabulators. Also, election equipment, such as the tabulators, although proclaimed by their manufacturers to be "air gapped," was connected to data centers which manipulated the vote tallies, either through actual phone chips on the motherboards of the tabulators or through virtual private networks.

51. On the evening of November 3, 2020, Election Day, in 4 swing states, Donald Trump was ahead, and for no known reason, even though the counting of ballots had never been previously stopped in any state, in the 4 swing states, the counting was stopped. Then, while the counting was supposedly not occurring, additional votes were counted in an instant, causing the graphs of the voting in each of those swing states to show a straight vertical line for Biden. As a result, the following morning, in each of the 4 swing states, Joe Biden was suddenly ahead. In all 4 swing states, the graphs were very similar: Joe Biden received approximately 97% of the vote,

which was statistically impossible. It was also obvious to most that something untoward had occurred.

52. Those who were not blinded by hatred toward Donald Trump were able to see instantly that the election results had been manipulated.

53. More evidence of the election fraud emerged, including the video from a camera which had been on the ceiling of the counting room in Fulton County, Georgia. There, the counting was stopped late on November 3, 2020, because of false reports of a broken water main. In fact, contrary to the excuse to stop the counting in Fulton County, Georgia, no water main broke or was in need of repair. After it was thought by the public that everyone left the counting room, 4 people remained behind and they reached under the tables which were aproned to conceal what was under them. The 4 people in the room pulled hidden suitcases out from under the tables. They opened the suitcases which were filled with unfolded (therefore not mailed) ballots which they then proceeded to put through the ballot tabulators over and over again.

54. Those who looked objectively at these issues were not fooled and they knew that the election system of the United States had been manipulated to give false conclusions of the tallies.

***Groups of Conspirators***

55. The individuals who created the theft of the Election involved leadership and actors who were engaged in ballot harvesting, manipulation of the adjudication of votes, and mainly in regard to the programing and manipulation by computers of the Election tallies. All of those individuals were seditionists and insurrectionists, and the American citizens who participated were traitors to the United States.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

56. Over the last decades, more and more people have been swayed to help the foreign interests who are attempting to defeat the United States. For instance, the educational system of the United States is, to a great extent, now controlled by Globalist Woke leadership, which is politically engaged against the Trump government, which is the government of the United States.

57. This does not make all members of such groups seditionists, insurrectionists, or traitors. However, once 2 or more Americans agree to take action against the interests of the United States, and one of the group performs an act in furtherance of their anti-American activities, they are part of a conspiracy to commit an insurrection, and they are guilty of a conspiracy to commit treason.

58. In this regard, there are numerous actors who may have never met or conferred with the architects of the insurrection against President Donald Trump, but who acted in concert for the same ends. These include the group of individuals who planned the events of J6 or participated in the planning and execution of the events, and the prosecution of the aftermath.

59. When the police acted in concert against the J6ers, they were acting as conspirators to effect the foreign takeover of the United States by going along with the plan. In this regard, the FBI placed 274 agents and informants on the grounds of the Capitol to cause protestors to enter the Capitol Building. Responsibility for those events of J6, especially for inducing the J6ers to enter the building, went all the way to the top, including Attorney General Garland and Director of the FBI Wray, who were acting as co-conspirators against America, making them traitors to the United States.

60. The Assistant U.S. Attorneys who pursued the J6ers with a vengeance because the J6ers supported President Trump also were their own group of co-conspirators who committed treason.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

61. The efforts of those who orchestrated the violence and the walking into the Capitol Building on January 6 were done so effectively that sensible law-abiding individuals, such as the chief judge of the District of Columbia, in Washington, D.C., who laid down the way that J6ers' cases should proceed, were apparently convinced that the J6 Defendants in her courts were the insurrectionists who stormed the Capitol Building. It is difficult to blame her for her reactions to the events which were perpetrated to fool the whole of the American public. It fooled the judiciary, too.

62. As such, at best, the Federal District Court Judges and Magistrate Judges who went along with the wrongful conduct were playing into the hands of the true insurrectionists who had planned J6 well in advance of that date. There was no reason for the judges, at that point, to even imagine that someone had previously planned to break the windows of the Capitol Building, to enter the building, and to have 274 FBI agents and informants present to induce the crowd to proceed toward the Capitol Building and to enter it.

***The Planning of Related Events Relating to the Rigged Election***

63. The covert infiltration into our election system would not have been complete without finding ways of curtailing those of the U.S. population who were expected to question the results of the Election and possibly generate an effective opposition to those who rigged the Election.

64. Part of the plan was to identify and limit the effectiveness of those who could upset the proverbial applecart of the devised election rigging. In that regard, plans were made to prosecute American citizens in authority and their attorneys who would possibly undermine the new government, the Biden government which was to be put into place. As a result, certain individuals, such as Tina Peters, Stefanie Lambert, Matthew DePerno, and others, were prosecuted



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

for alleged election-related crimes where the prosecutors had to twist the law because no crimes were actually committed. Those victims of the conspiracy were attempting to preserve the evidence or maintain the truth of what had occurred. They were heroic American patriots, not criminals.

65. Moreover, the companies which manufactured and/or sold the corrupted election equipment would file lawsuits against anyone who criticized their machines. Ultimately, lawsuits were filed against patriots such as Michael Lindell, Patrick Byrne, Joseph Oltmann, the Trump Campaign, and many more.

66. Of utmost importance, all the rest of the opposition to the preposterous idea that Joe Biden emerged from his basement to be the victor with more votes than Barack Obama received needed to be nipped in the bud with slogans such as calling allegations of election fraud the "Big Lie," getting all lawsuits claiming election fraud dismissed before any evidence was presented.

67. Some who were falsely put in trusted positions, but who were actually moles waiting to be utilized, such as William Barr, the Attorney General of the United States, suddenly took positions contrary to Donald Trump. William Barr, for instance, just prior to his appointment as Attorney General, had been a partner of the law firm Kirkland & Ellis, which represented Staple Street, which had purchased Dominion. He made public pronouncements that he did not see any indications of election fraud. Unfortunately, this was trickery, as he gave the impression that the Department of Justice looked for such fraud and was not able to find any. In fact, he was being deceptive in that he failed to also advise that he never looked.

***J6 was a Psy-Op***

68. Of all the plans to take over the United States by infiltrating our election systems, one of the greatest was to commit a psychological operation, a "psy-op" against the protestors who the seditionists, insurrectionists, and traitors knew would be traveling to the Capitol Building in Washington, D.C., on January 6, the J6ers.

69. Although the foreign intervention in the election, itself, is not the subject of this Complaint, the conspiracy to wreak havoc at the U.S. Capitol on January 6 and use those events to cause an aftermath of harm to those patriots who attended at the U.S. Capitol on that fateful date was planned in advance and executed according to plan as part of the general scheme to take over America.

70. The Globalists knew that those true to Donald Trump would be traveling to the U.S. Capitol to attend a protest planned for January 6, as they were the ones who saw and understood that the Election had been rigged. They were the equivalent to the "Early Adopters" who are the first to buy products with new technologies. Without Early Adopters buying products with new technologies, they would not succeed, and likewise, without the protestors who were early in accepting the truth of the rigged Election, the general public's opposition to the election rigging could not succeed. The psy-op was genius.

71. Long before January 6, in fact, going back at least to September of 2020, active participants in what has been called the "Deep State" with various nongovernmental organizations ("NGOs"), including Globalists, Patrick Young, Lisa Fithian, Maria Stephan, and Erica Chenoweth, along with hundreds of others, actually knew January 6 was the date that the votes of the Electoral College would be counted and that Biden would be named as the winner of the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

election at the Capitol that day. These traitors conducted Zoom meetings to plan how the Globalists were to turn a peaceful protest of the conservative J6ers into the appearance of a riot.

72. Those seditionists, insurrectionists, and traitors, as early as August or September of 2020, long before the Election, itself, actually plotted to break some of the windows of the Capitol Building so that their compatriots and foreign participants would enter the Capitol Building to unlock and open the doors of the Capitol so that the anticipated protestors outside would be herded into the Capitol Building.

73. The plan was a trap to identify and destroy the tip of the spear of opposition to the election rigging. It was a psy-op designed to stifle public outcry of the rigging of the Election, itself.

74. Others were involved, such as Nancy Pelosi, who, as Speaker of the House of Representatives, was responsible for the safety of the membership. When offered 10,000 National Guard troops, she rejected any help. She later admitted her responsibility.

75. These Globalists borrowed from the gamebook of Adolf Hitler, who, 28 days after he was appointed Chancellor of Germany on January 30, 1933, had his storm troopers burn down the equivalent of Germany's capitol structure, the Reichstag. By doing so, he was able to take absolute power and became the Führer within 60 days of his appointment as Chancellor.

***The Rigging of the Election Had Been Obvious to the J6ers***

76. After the Election, the Americans who supported Donald J. Trump could see that the Election had been rigged. To them it was obvious as no state in the country had ever stopped the counting of ballots after the counting began. Then, on election night of 2020, in 4 swing states in which Trump was ahead, the counting stopped (supposedly by coincidence), and in the morning, when the counting recommenced, Biden was in the lead in each state, with a staggering percentage



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

of the votes which came in after the counting was suspended. For instance, in Michigan, after the polls closed, instantaneously, Donald Trump received 5,968 votes while in that fraction of a second, Joe Biden received 141,258 votes.

77. In Arizona, 22,093 mail-in ballots were received the day before they were supposedly mailed.

78. In Fulton County, Georgia, the J6ers saw the video from the camera which had been mounted on the ceiling of the ballot counting room.

79. In Pennsylvania, the commonwealth mailed out 1,823,148 ballots and received 1,462,302 back. Yet, it counted 2,589,242 mail-in ballots, which were approximately 4:1 in favor of Joe Biden.

80. There is actually a wealth of evidence, at this point, but the point is that very early after the Election, people who favored Donald J. Trump began to file lawsuits, but they lacked standing. Approximately 60 lawsuits were dismissed without any judge examining any evidence.

***The Untoward Events Including Breaking of the Windows of the Capitol All Were a Great Success for the Globalists and Foreign Interests***

81. All went according to plan. President Trump encouraged protestors to go to the Capitol. The trap was set in what would prove to be the greatest and largest conspiracy in the history of the United States.

82. Many American patriots, including the J6ers, are citizens of different states who traveled to Washington, D.C., on or before January 6 in general support of President Donald Trump.[1]

[1]Note that motivations varied widely, and some plaintiffs were motivated more by a need to raise awareness regarding various issues including public health overreach and/or election integrity generally.

83. At their own expense, they each traveled to Washington, D.C., and found accommodation, so that they could attend speeches and rallies and gather at the U.S. Capitol to attend additional speeches and to assemble, pray, sing, learn, and protest their grievance of witnessing what seemed to be the demise of our country.

84. With all of the trappings in place, the plans for January 6 were successful. The J6ers were cajoled, directed, and forced by CS gas and other insults to their bodies to enter the Capitol Building.

85. Many other incidents occurred, including the beating to death of Rosanne Boyland, the deaths of 2 J6ers as a result of concussion grenades being launched at them, and the horrendous death of Ashli Babbitt.

86. The circumstances of her death appear to have been pursuant to another, more specific plan to make the "riot"; there was a need for horrible things to occur. The film director and photographer John Sullivan just happened to be present with his crew to film the shooting, where supposed SWAT team members were present and then apparently changed their clothing after their parts in the performance were concluded.

87. The 274 FBI agents and informants who were present in the crowds were successful in concealing their true identities, and they succeeded in moving the crowds forward and into the Capitol Building, where they became susceptible to being charged with misdemeanors and potentially felonies, as they later were.

88. The psy-op worked like a charm where the American people, including the judges in the D.C. federal courts, were outraged by the conduct which they understood to have been started by the J6ers.

***Pipe Bomb Fairy Tale, a "Gallows" Constructed with Government Permission, and a Scaffold Commander Urging Protestors to Move Forward***

89. Upon arrival at the Capitol on January 6, the J6ers found themselves in a confusing setting, with no signs regarding scheduled events and few visible law enforcement officers. A cheaply constructed "gallows" with a hanging noose had been erected by never-identified persons with apparent government permission.[2]

90. Although there were sections of minor fencing erected on the grounds early on J6, that fencing was mostly removed by afternoon, and the vast majority of the J6ers freely strode upon the Capitol Grounds without any obstructions or indications that they were not permitted to go there.

91. Capitol Police officials in league with the general conspiracy to harm the protestors later falsely testified at trials, at the direction of the Garland DOJ, that the Capitol was ensconced in near-fortress-like security.

92. Within minutes of the beginning of Congress' scheduled electoral vote proceedings, government officials announced that "pipe-bombs" had been found at nearby Republican and Democratic National Committee headquarters. It was the supposed finding of "pipe bombs," and not any conduct by any J6ers, that first caused proceedings at the Capitol to

[2]Note that the gallows qualified as an installation and required a permit for placement on the Capitol Mall. The installation took more than an hour to set up, during morning hours before large crowds arrived.

pause.[3] The story of pipe-bombs was constantly changing[4] and involved agents of the Capitol Police, Vice President-elect Kamala Harris, and the Secret Service. The pipe-bomb announcement triggered evacuations, closures, and shelter-in-place orders which ultimately culminated in a six-hour delay of Congress. All of this was later wrongfully blamed on the J6ers.

***The Afternoon Unfolded According to Plan***

93. Not only did the seditionists, insurrectionists, and traitors in the Deep State and certain NGOs plan to break the windows of the Capitol Building, to have agents go into the Capitol through the broken windows, and to open the doors of the Capitol so that protestors who would be on the Capitol grounds could be directed into the Capitol building, but the FBI infiltrated the crowds which surrounded the Capitol with a united plan to move the crowds forward and ultimately into the Capitol Building. They had 274 agents and others under their control in place to accomplish this.[5]

94. Then, around 1:00 p.m. on January 6, many of the Plaintiffs witnessed undercover FBI agents and CIs, etc. shouting, "Go! Go! Go!" commanding and directing the crowds to move

[3]From another J6er's statement of facts: At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters. United States v. Tommy Allan, Case 1:21-cr-00064-CKK Document 1-1 Filed 01/20/21 Page 4.

[4]Christopher Wray's FBI fabricated or doctored video and released fabricated slowed-down, deliberately grainy footage of the "pipe bomber" to the public so as to prevent 'solving the crime' (while Wray's FBI was purportedly offering a large reward for the supposedly elusive 'bomber'). The "pipe bombs" themselves resembled stock dummy devices with less-than-one-hour kitchen timers. Private journalists later showed that Capitol Police bomb squad members knew precisely where to look for the "bombs"—obviously having foreknowledge. The FBI is known to have made several phone calls to The Blaze Media seeking to stop The Blaze's reporters from continuing their investigation.

[5]In furtherance of their plan, the FBI kept secret the fact that they had 274 agents and confidential informants at the Capitol until September of 2025.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

forward, toward the Capitol Building. One instigator nicknamed the "scaffold commander" positioned himself on a scaffold tower with a megaphone, shouting at the thousands of protestors to move closer and enter the Capitol. Another never-identified instigator, wearing a red "MAGA" cap with a price tag still affixed, broke and smashed the first window of the Capitol on the West side, to allow infiltrators to climb through the windows. That was according to the plan of the seditionists, insurrectionists, and traitors who rigged the 2020 Presidential Election and then participated in and planned the events of January 6, as a psy-op to dissuade organized challenges to the rigged election.

95. The identity of the instigators has been well known to Wray's FBI for years, and those instigators have been under Wray's and Garland's protection.[6] Also, the paucity of law enforcement security on January 6 was deliberate.

96. As events unfolded on the Capitol's west side, Capitol Police officers on the east side engaged in trickery with crowds of protestors, promising crowds (sometimes over megaphones) that police would try to help protestors approach more closely to the Capitol doors. When J6ers saw barriers removed on the east plaza, the protestors rushed forward, thinking officers had approved their advancement to the steps of the Capitol. Notwithstanding the obvious entrapment, the Plaintiffs were later charged with crimes for doing so.

[6]Another similar example involves a mysterious man wearing a gas mask who pushed J6er Will Pope into the Capitol at the east side's carriage doors. Just as with Scaffold Commander, MAGA-hat guy and the pipe bomber, Garland's DOJ prosecutors claimed they possessed no information about the man who pushed Pope inside the building (making Pope the first J6er to breach the east side). But after three years and much diligent research by Pope, DOJ admitted that the gas-mask-wearing individual was known to the government and that the individual possessed a federal security clearance. See https://x.com/FreeStateWill/status/2006853257902305719 (accessed 1/2/2025).

97. When Capitol Police on the Capitol's west side repeatedly used force and possibly lethal force[7] on the J6ers, the festive or pensive milieu quickly changed. Metropolitan Police bombarded the crowds of peaceful protestors who had been praying and singing songs like God Bless America with percussion grenades, teargas, and rubber bullets, notwithstanding that they did nothing to provoke such an attack. Moreover, the Capitol Police caused bloody injuries to J6ers which further enraged the crowd and led to an escalation of violence in reaction and in self-defense.

98. During the events of that day, federal law-enforcement officers, including but not limited to officers of the Metropolitan Police Department and other federal agents, deployed chemical irritants (including pepper spray and tear gas), batons, flash-bang devices, and other less-lethal munitions against the Plaintiffs and the crowd without justification and in a manner that was excessive, unreasonable, and in violation of the Plaintiffs' rights.

99. Worse, at approximately 2:24 p.m., the Metropolitan Police were running low on, or had run out of, their teargas and percussion grenades. They were down to a box of CS Gas canisters. CS Gas is so horrific in its effects that it is a crime to use it in war. It causes severe inability to breathe, panic, high anxiety, and raw anger. A Metropolitan Police officer aimed a shot of a CS Gas canister at scaffolding on which some J6ers had climbed, but the wind caught the canister and took it to a line of Capitol Police, causing that line to break. Then the rest of the supply of CS Gas was shot into the crowds of protestors.

100. As a direct and proximate result of unlawful use of force, the Plaintiffs suffered injuries including chemical burns to eyes and respiratory systems, contusions, lacerations, and exacerbation of pre-existing conditions.

[7] Capitol and Metro police officers, including Shauni Kerkhoff and Anthony Campanale, used "less than lethal" weaponry such as pepper ball guns in a manner that was lethal under the law, rules and training.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***The Largest General Search Warrants in American History***

101. Soon after January 6, Attorney General Garland, U.S. Attorney Graves, and FBI Director Wray, in furtherance of the conspiracy to cause the protestors grave harm, and in furtherance of unseating the government of the United States with Donald J. Trump, President, violated Fourth Amendment limitations in their investigations of J6ers. These acts were all acts of sedition, insurrection, and treason. These federal officers crafted and used the largest and most general search warrants in history to identify every cell phone at the U.S. Capitol on January 6. The warrants were so general that they didn't even try to state suspicion that any individual committed any specific crime, as the U.S. Constitution requires. Rather, the warrants simply listed a menu of ten-to-twelve possible crimes (including crimes which never occurred such as murder) and alleged that possessors of cell phones were either perpetrators or witnesses of such crimes. These federal officers used these unlawful search warrants to find and identify the Plaintiffs, despite having no probable cause at the time of the issuance of the warrants.

***Government-Funded Vigilante Stalkers***

102. Wray's FBI also funded and provided illegal material support to a private vigilante group, "the Sedition Hunters," who worked to identify and investigate J6ers by both legal and illegal means. Among other things, Wray's FBI violated court orders by providing Sedition Hunters with court-protected discovery. J6ers such as Lyons and Williams were identified by this secretly government-funded vigilante group. J6er Allan was stalked by Sedition Hunters who repeatedly tried to get Allan fired from his job. J6er Abual-Ragheb was also stalked and harassed by Sedition Hunters, as were some of the Plaintiffs in this Complaint.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

103. In support of the conspiracy to harm the J6ers, the FBI hid its support for Sedition Hunters for years, until after all J6er prosecutions ended and it was too late for J6ers to challenge illegal searches, stalking and harassment.[8]

***Savage, Militarized, Pre-Dawn SWAT-Style Tactical Arrests Over Misdemeanors, Even for Those Whose Lawyers Said They Would Self-Surrender.***

104. In most ways the J6 protest demonstrations were similar to hundreds of other rallies and protests at the Capitol over generations. Under well-settled state and federal law, demonstrators at capitols and legislative assemblies were to be allowed to speak freely and be given avenues for expressing and demanding redress.[9] Even if accused of trespassing or other misdemeanors, protestors must be given multiple warnings and opportunities to depart or comply with commands.[10]

105. FBI Director Christopher Wray and Attorney General Merrick Garland directed that FBI agents be diverted from serious, violent, and sexual crime investigations to focus on misdemeanor January 6 investigations.[11] In many cases, J6ers were subjected to early morning

---

[8]See Ken Silva, "Online Sleuths who Hunted J6ers were FBI Informants," Headline USA, Jan. 21, 2026, https://headlineusa.com/online-sleuths-who-hunted-j6ers-were-fbi-informants-new-docs-reveal/

[9]See D.C. Law, Ch. 3A § 5–331.03. Policy on First Amendment assemblies. "It is the declared public policy of the District of Columbia that: (1) Persons and groups have a right to organize and participate in peaceful First Amendment assemblies . . . and to engage in First Amendment assembly near the object of their protest so they may be seen and heard. . ." (2) "MPD shall not engage in mass arrests of groups that include First Amendment assemblies or that began as a First Amendment assembly unless MPD: . . . (B) Has issued an order to disperse . . ." See also ACLU, Demonstrating in D.C.: Know Your Rights (2025); Metropolitan Police Department, First Amendment Demonstrations (2021).

[10]See, e.g., Adderley v. Florida, 385 U.S. 39 (1966) (upholding trespassing convictions for student protestors at a jail; but unanimously stating that such protesting at a legislative capitol would be a defense to trespassing charges); Edwards v. South Carolina, 372 U.S. 229 (1963) (ruling that the First Amendment forbade state government officials to force a crowd to disperse when they are otherwise legally marching in front of a state capitol).

[11]Note that such staffing decisions are administrative, rather than prosecutorial, decisions.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

paramilitary arrest-raids despite previously contacting the FBI through attorneys to arrange peaceful meetings or surrenders.

106. Prior to January 6, most FBI agents had never arrested anyone for misdemeanors (as such offenses are generally initiated by citations). However, in furtherance of the conspiracy to commit insurrection and sedition, Wray and Garland implemented the "shock and awe" program. They directed that armored FBI and paramilitary SWAT-style tactical teams with military equipment descend on the homes of J6ers who were accused of being misdemeanants. Wray and Garland directed that the raids be conducted in a terrifying manner, with explosives and battering rams and teams of agents displaying masks, helmets, body armor, and semi-auto and automatic rifles.[12]

107. Wray's agents smashed and tore off the Plaintiffs' doors and gates, using flashbang grenades to traumatize the Plaintiffs. Wray's agents also commanded that local police assisting in the terror raids turn off their body cameras, often in direct violation of local police policies. That was done so that there would be no evidence of how they treated the J6ers.

***Overzealous Prosecution As "National Security"***

108. Garland, Graves, Wray and the other federal officials gave countless public statements describing the J6 demonstration in the course of their employment and accused the J6ers of attacking the Capitol, Congress, and even democracy, itself.[13] Those officials peppered their pleadings, complaints, and arguments with national security justifications and false

[12]Upon information and belief, no accused J6er (out of more than 1,500) offered any violent resistance or obstruction during these arrests and abusive raids.
[13]Confirmation hearing, January 2021. When nominated, Mayorkas said if confirmed, he would do "everything I can" so that such an assault on the legislative branch and symbols of democracy would not happen again.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

defamatory language.[14] In accordance with this "national security" artifice, these officials spent the next four years feverishly preventing J6ers from arguing or even invoking the protections of the First Amendment.

109. Each J6 criminal prosecution began with government motions for protective orders, based on fake 'national security' grounds. The motions prevented J6ers and even judges from discovering the DOJ's concealed deceptions and fabrications, and they prevented the public from assisting J6ers. The DOJ falsely proclaimed that the locations of overhead cameras at the Capitol (which millions of people had seen while touring the Capitol) were so top secret that "national security" would be jeopardized if J6ers were able to share surveillance camera footage with the public.

110. The United States designated much of the discovery "sensitive" so that J6ers could only view it in the presence of their attorneys. This prevented many J6ers from putting on a defense because they lived at great distances from their attorneys.

111. The officials' true reason for demanding the protective orders was to keep the public from being able to identify undercover operators in the J6 crowds, which would have revealed the true scope of government entrapment and government distortion.

[14] See Luke Barr and Alexander Mallin, "AG Garland testifies Jan. 6 insurrection was 'most dangerous threat to our democracy,'" ABC News, May 12, 2021 ("Attorney General Merrick Garland told the Senate Appropriations Committee on Wednesday that he has not seen a more dangerous threat to democracy than the 'invasion' of the Capitol on J6, which he called in written testimony a 'heinous attack' and 'intolerable assault.'")



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***The "Capitol Siege" Section and The Application of Military Language And Techniques to J6 Investigations.***

112. The United States named the DOJ unit prosecuting the J6ers the "Capitol Siege Section," using terminology rooted in military strategy with no criminal-law meaning.[15] They established a website for the "Siege" section.[16] That unit, which was operating to support the sedition, insurrection, and treason against the President of the United States, ironically loaded its charging documents with military language, referring to the J6ers as the "insurrectionists" and focusing on "breaches" of "perimeters," and "storming" the Capitol. DOJ pleadings constantly referred to the demonstration as "the attack" on the Capitol.

113. Pursuant to their plan against the government of the United States, Graves, Garland, and other federal officials turned J6 prosecutions into acts of partisan warfare. They invited DOJ lawyers who politically opposed Trump and MAGA conservatives to relocate to D.C. and "join this mission" because they "believed in the defense of democracy."[17] Those prosecutors viewed their investigations, not as justice inquiries into crimes, but as a "criminal inquiry into efforts to stop the peaceful transfer of power."[18] They were used by the true seditionists, insurrectionists, and traitors who rigged the election and then assisted in squelching any accountability in their effort to take over America.

---

[15]A siege refers to a military operation in which armed forces surround a place, usually a fortified city or stronghold, with the goal of cutting off essential supplies and forcing the enemy to surrender.
[16]https://www.justice.gov/usao-dc/capitol-breach-investigation-resource-page (now defunct).
[17]Ryan J. Reilly, "Jan 6 prosecutors describe 'shocking' 'guttural' week after Trump's pardons," NBC News, Jan. 24, 2025, https://www.nbcnews.com/politics/justice-department/jan-6-prosecutors-describe-shocking-guttural-week-trumps-pardons-rcna188970 (accessed 10/1/2025).
[18]Ryan J. Reilly, "As Jan 6 probe expands, officials worry DOJ resources are at a breaking point," NBC News, July 29, 2022, https://www.nbcnews.com/politics/justice-department/jan-6-probe-expands-officials-worry-doj-resources-are-breaking-point-rcna40208 (accessed 10/1/2025).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

[19]***Involvement of the "National Security Division":***

114. Garland, Graves, and the other DOJ officials collaborated with the "National Security Division's Counterterrorism Section" on many J6 prosecutions, treating the cases as counterterrorism efforts.[20] Garland, Graves, and other officials explicitly proclaimed that J6 verdicts were obtained through the "National Security Division's Counterterrorism Section."[21] J6 convictions were described as "battlefield victories." DOJ spokesmen proclaimed that the DOJ was bringing "accountability to [J6ers] who attacked our democracy on January 6." The United States' use of the Joint Terrorism Task Force invoked national security weaponry over matters that had nothing to do with terrorism.

***Selective Targeting and Prosecution of J6ers***

115. Over the years, similar or even greater intrusions by demonstrators at the Capitol had been punished with $25 or $50 fines, even for protestors who forcefully occupied Capitol spaces and refused orders to leave and resisted attempts to remove them. However, the officials in this case selectively prosecuted the Plaintiffs herein with unique charges never applied in similar

---

[19]Note that the DOJ's "National Security Division" has a stated mission which strays markedly from a pure prosecutorial mission: "The mission of the National Security Division is to protect the United States from threats to our national security by pursuing justice through the law. The NSD's organizational structure is designed to ensure greater coordination and unity of purpose between prosecutors and law enforcement agencies, on the one hand, and intelligence attorneys and the Intelligence Community, on the other, thus strengthening the effectiveness of the federal government's national security efforts."

[20]For example, in a January 6, 2025, press release on the San Diego U.S. Attorney's Office's role, GARLAND's DOJ stated: "These cases are being prosecuted through a collaboration led by the U.S. Attorney's Office for the District of Columbia and the Department of Justice National Security Division's Counterterrorism Section."

[21]For example, GARLAND's November 7, 2023, press statement that "This case is being prosecuted by the U.S. Attorney's Office for the District of Columbia and the Department of Justice National Security Division's Counterterrorism Section."



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

circumstances, which were vindictively escalated to life-crushing felonies for the vast majority who insisted on trials.

116. Similarly situated individuals—those who engaged in violence, property destruction, or disruption of government functions during 2020 protests— were not prosecuted with comparable vigor or at all. That selective enforcement was based on the Plaintiffs' political viewpoints and was orchestrated at the highest levels of the DOJ and FBI who participated in the sedition, the insurrection, and the treason to take over the United States.

117. Even past demonstrators who had disrupted the precise, identical proceedings on prior[22] January 6 dates had been given $50 fines. Three protestors arrested on Jan. 6, 2017 got $50 fines for disrupting the identical certification ceremony. There were no claims of Secret-Service "restricted areas" for such demonstrators, despite the presence of VP Biden.

118. There were even demonstrators who committed the precise, identical conduct of picketing or parading at the Capitol alongside and surrounded by J6ers; those demonstrators never feared arrest because they were anti-Trump, pro-Biden protestors. For example, a pro-government extremist demonstrator named Patricia Eguino was never arrested by the Biden DOJ because she was a Democrat, despite Ms. Eguino brazenly holding political pickets on January 6 on the upper east terrace of the Capitol. Those around Ms. Eguino were prosecuted; Ms. Eguino was not.

119. Even demonstrators at the Capitol who forcefully or violently disrupted official proceedings in years past were given $50 fines, if prosecuted at all. Several notorious pro-

---

[22] See Zoe Tillman, "Protesters Arrested As Congress Certifies Trump's Victory," Buzzfeed News, January 6, 2017, https://www.buzzfeednews.com/article/zoetillman/protesters-arrested-as-congress-certifies-trumps-victory (accessed 1/10/2026) (saying protestors Renaldo Pearson, Tania Maduro, and Ryan Clayton "were each charged with one count of disruption of Congress, a misdemeanor that carries a maximum penalty of six months in jail." "The protesters were released Friday evening after posting and then forfeiting $50, a process under District of Columbia law available for certain low-level misdemeanors that resolves the charges.")

Democrat protestors have been detained many times each for obstructing congressional proceedings, but were never prosecuted for 20-year felonies.

120. The officials herein turned a routine Capitol protest and 6-hour delay[23] of Congress into the largest and most expensive investigation in American history, with an overarching aim of chilling and suppressing the expression of particular viewpoints and grievances. The officials fabricated evidence, concealed and withheld exculpatory evidence, made knowingly false statements in affidavits, pleadings,[24] and official proceedings related to the Plaintiffs' prosecutions, and exaggerated, concocted and manufactured threats and injuries, to secure wrongful charges, convictions and sentencings.

121. Note that the systematic targeting of a class of people due to affiliation with a politically unpopular or ousted ideology is administrative rather than prosecutorial conduct. Reno v. AADC, 525 U.S. 471 (1999). Participation in silencing dissent concerning the rigging of the Election was a carrying out of the aims of the conspiracy to commit sedition, insurrection, and treason by all involved.

---

[23]Note that other protests at the Capitol have shut down Congress for much longer periods. For example, the Kavanaugh confirmation protests in 2018 stopped and disrupted proceedings for days. The May Day protests of 1970 also disrupted Congress for days. The Bonus Army occupation of 1932 shut down congressional proceedings for many days.

[24]The Statement of Facts presented by the government in Tommy Allan's case is illustrative: "Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. . . At least one of the subjects carried a handgun with an extended magazine." Each of these statements is false. The most serious injury to any officer was a broken finger. The most common injury was "pain." No officers died as a result of injuries from J6. No member of Congress was ever in the same room as any demonstrator. No J6er was ever accused of entering the Capitol with a firearm. United States v. Tommy Allan, Case 1:21-cr-00064-CKK Document 1-1 Filed 01/20/21 pp. 5–6 (emphasis added).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

122. Moreover, the conspiracy was committed by learned judges who were onboard to make sure that the sentences for J6ers were by far the harshest in U.S. history for political protesting, rioting, or demonstrating of any kind. Indeed, the longest prison sentences for J6ers were many times longer than those for any comparably situated political demonstrator or rioter in history, and the first, second, and third highest individual misdemeanor fines in U.S. history were all imposed on J6ers.[25] Perhaps, some judges should be investigated and prosecuted for their horrendous conduct. No recommendation as to judges is being made, but treason is treason, and donning black robes should not protect anyone from being charged with treason if it is a crime committed.

123. Wray's FBI illegally placed J6ers on Terrorist Watch Lists and "SSSS" flight restrictions which subjected them to extra security measures during air travel, including strip searches.

124. The United States de-banked and facilitated the debanking of J6ers so that J6ers were denied access to credit institutions. The United States also secretly directed and facilitated the deplatforming of J6ers from social media.

125. Acts such as spreading disinformation, imposing a program of shock-and-awe[26] pre-dawn paramilitary SWAT-style raids to terrify and traumatize arrestees (causing numerous

---

[25]J6er Rebecca Lavrenz now holds the all-time record with a $103,000 fine. The second heaviest fine in history for a misdemeanor was levied on another J6er, Brady Knowlton ($75,000). Third place seems to be a tie with a criminal defendant named Robert J. Brenna Jr. (New York) who paid a $25,000 fine in 2003 for violating the Clean Water Act (the highest until January 6). J6er Paul Johnson's $25,000 fine apparently tied Brenna's 2003 fine for third place.

[26]See Scott Pelley, "Inside the prosecution of the Capitol rioters," 60 Minutes, March 22, 2021, https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03-21/ (accessed 5/19/2025) (Acting U.S. Attorney Michael Sherwin explained that "our office wanted to ensure that there was shock and awe …. And it worked because we saw through media posts that people were afraid to come back to D.C. because they're like, 'If we go there, we're gonna get charged.'"); Jonathan Turley, "How Prosecutors Turned January 6 Rioters into

suicides, attempted suicides and miscarriages), setting up a snitch line to maximize arrests and social division, staging deployments of explosives against accused misdemeanants,[27] certifying the world's most expansive general search warrants in history without probable cause,[28] materially supporting private vigilante groups to hunt down suspected J6 demonstrators, throwing out settled pretrial detention standards to keep nonviolent J6ers behind bars without convictions,[29] placing Americans on watch lists, facilitating the de-banking of U.S. citizens, concealing and withholding the role and numbers of undercover government operatives and informants among demonstrators on January 6, applying constrained 20-year-prison "obstruction-of-official-proceeding" charges to political demonstrators, punishing J6ers who refuse to plead guilty with retaliatory charges commanding 40-times-greater sentences, and threatening or arresting defense witnesses to prevent

---

Martyrs," New York Post, Jan. 20, 2025, https://nypost.com/2025/01/20/opinion/how-prosecutors-turned-january-6-rioters-into-martyrs/ (accessed 5/18/2025) ("The Justice Department set out to send a chilling message to the nation. In an interview with CBS News a year later, Justice Department official Michael Sherwin indicated that they wanted to send a message with the harsh treatment of defendants.").

[27]See Burns v. Reed, 500 U.S. 478 (1991) (prosecutors do not have absolute immunity when giving legal advice to police regarding investigative stages of case, as such conduct is more administrative/investigative).

[28]See Kalina v. Fletcher, 522 U.S. 118 (1997) (certifying facts in an affidavit for probable cause was not entitled to absolute immunity—only qualified).

[29]In February 2021, the DOJ worked with Chief Judge Beryl Howell to create guidance for whether J6ers should be granted pretrial release. This guidance was known as the "Chrestman 6" (or "Chrestman factors"). United States v. Chrestman (Case No. 21-mj-218). Howell granted the government's motion for review of a magistrate's pretrial release order, stayed the release, and ultimately ordered pretrial detention. The six factors were (1) felony or misdemeanor, (2) "the extent of the defendant's prior planning," (3) whether the defendant used or carried a weapon, (4) evidence of coordination with other protesters, (5) whether the defendant played a leadership role, and (6) the defendant's words and movements during the riot. This framework helped keep nonviolent J6ers in jail indefinitely; J6ers needed to plead guilty or be held through trial. It was the first time an entire category of defendants was subject to special bail rules that didn't apply to others. And the Chrestman factors added factors for pretrial release beyond what the Bail Reform Act required. And the Bail Reform Act, 18 U.S.C. § 3142, enacted during the tough-on-crime Reagan presidency, was itself controversial for expanding pretrial detention. See United States v. Salerno, 481 U.S. 739 (1987).

the J6ers from defending themselves are administrative, "national security," and investigatory conduct, not prosecutorial advocacy.

***Prosecutors***

126. Acting U.S. Attorney for D.C. Michael R. Sherwin was responsible for organizing his Assistant U.S. Attorneys ("AUSAs") and, pursuant to the plan to take over the United States, attempted to blame President Donald J. Trump for sedition, when he, himself, ironically, was actually guilty of the conduct he attributed to President Trump.

127. John Crabb Jr. was the Chief of the Criminal Division of the Office of the U.S. Attorney in D.C. and was the direct supervisor of Thomas Windom on the January 6 Detail. J.P. Cooney acted as Deputy Special Counsel to Jack Smith. These two commenced investigations against President Trump and "individuals within his orbit" regarding the lead-up to J6, in their attempt to accuse Donald Trump of insurrection, and offered false testimony to the J6 Select Committee. One of the worst conspirators who conspired with Jack Smith as his deputy was Molly Gaston, who took pride in announcing that a grand jury had returned a true bill in August of 2023 against President Donald J. Trump.

128. Gregory Rosen was the Chief of the Capitol Siege Section, Breach and Assault Unit in the office of the U.S. Attorney for D.C. His office worked in conjunction with the above-named conspirators. He worked together with Prosecutors Carlos Valdivia and Samuel White who, in a Taranto sentencing memorandum which they filed, described J6 as "a mob of rioters," consistent with the needs of the seditionists, insurrectionists, and traitors to the United States. Their work was part and parcel of the destruction of the tip of the spear of objections to the election which had been rigged.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***Judges Joined the Prosecutors in Subjecting J6ers to Unprecedented Treatment.***

129. The most disappointing aspect of the takeover of the United States by foreign forces and left-wing/Globalist extremists was the way that the vast majority, but not all, of the District Court Judges and Magistrate Court Judges were united between themselves in the District of Columbia to destroy the lives of the J6ers. All of their actions were done beyond the bounds of reason and were unwittingly in furtherance of the purpose of sedition, insurrection, and treason against the United States of America. This was a demonstration of how effective the Globalists were in misleading the public and the judges. It is completely understandable that a judge who saw and watched and then saw accounts of what occurred on J6 would think that the J6er on trial was evil. Unfortunately, the judges were all fooled into believing the scenario which appeared to be real, but was not.

130. Of all of the judges, though, there was one who knew or should have known the truth, U.S. Magistrate Judge Moxila A. Upadhyaya, who was one of the most extreme in her anti-J6er rhetoric and rulings. She was surely a fox in the henhouse who had her own goals and agenda. Prior to her being appointed as a Magistrate Judge, she was an attorney who represented the one who was the key to exporting election equipment and its insidious programing designed to control the results of the Election, the President of Venezuela, himself, Maduro. Maduro was her client. Her conflict of interest was not only real. It was extreme. The J6ers were 100% opposed to the one responsible for rigging the Election and that was Magistrate Judge Upadhyaya's former most important client.

131. Not all, but almost all of the D.C. District Court judges and the Magistrate Judges willfully acted under the color of law to deprive J6ers of their rights including due process and their First Amendment rights.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

132. The judges of the D.C. District and Circuit were witnesses to the events of J6, because the U.S. Prettyman Courthouse is adjacent to the Capitol Grounds and the judges had watched the events from their courthouse windows.[30] Normally such personal observation of supposed crimes would require recusal or transfer of venue. Nonetheless, the judges uniformly denied motions to disqualify them or to change venue.

133. Forcing J6ers to defend themselves in D.C. meant that the proceedings were tilted in favor of the prosecution. Polls showed that D.C. residents regarded themselves as victims of J6ers and prejudged J6ers to be guilty. Polls also showed that D.C. residents wanted J6ers punished by life imprisonment or the death penalty.

134. Moreover, the residents' local elected officials had all made points of singling out J6ers for abuse. D.C. city officials had even held town hall lectures and park presentations against J6ers. The D.C. mayor had issued parking bans and requests for businesses to shut down in advance of J6. The D.C. mayor also ordered businesses to close early on the evening of J6. (Later, J6ers would be prosecuted under 18 U.S.C. § 231 for adversely affecting commerce, and prosecutors even presented business managers as witnesses to the J6ers' supposed harm to the economy—bearing profit/loss data.)

135. The judges of the D.C. District also agreed with prosecutors that J6ers could never offer evidence regarding the improprieties of the 2020 presidential election. This was basic exculpatory evidence regarding innocent motive. But these judges' rulings did not stop the judges

[30]During closing arguments in the biggest J6 trial, the Proud Boys trial of December 2022–April 2023, prosecutors finished by drawing jurors' attention to the proximity of the courthouse to the action of J6. This was intended to impress upon the jurors a sense of personal fear and attachment to the facts of the case.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

themselves from pronouncing, as supposed fact and law, that the 2020 election was properly won by Joe Biden as an aggravating factor at sentencings.

***The United States' Novel Theories of Law and Abuse of Statutes To Maximize Imprisonment of Plaintiffs.***

136. The United States, which had been taken over by foreign and domestic forces who continued the conspiracy of sedition, insurrection, and treason against the United States, used novel theories of law[31] to target the Plaintiffs for false charges such as "obstruction of official proceedings" and "entering and remaining in a restricted area."

137. While there are federal trespassing statutes which explicitly apply to the U.S. Capitol,[32] such statutes provide only a petty offense and plainly exempt mere presence in public areas where most J6ers walked and demonstrated. For Garland and Graves to act according to their plan, they chose to use an ill-fitting Secret-Service "restricted area" statute, 18 U.S.C. § 1752(c)(1)(B), to maximize penalties and imprisonments of the Plaintiffs. However, § 1752

---

[31]For example, many J6ers who merely walked or stood in places were convicted of "disorderly conduct" based on a theory (the "raindrop theory") that Jan. 6 protesters shared equal guilt for rioting, like raindrops that join to create a flood. See, e.g., United States v. Rivera, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field."). The government also used "Seditious Conspiracy" charges against Oath Keeper and Proud Boy leaders based on a notion that U.S. citizens protesting the outcome of an election qualified as an attempt to "overthrow" the government.

[32]40 U.S.C. § 5104(e)(2) Violent entry and disorderly conduct.--An individual or group of individuals may not willfully and knowingly-- (A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House; (B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House; (C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of-- (i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress;

focuses on the authority of the Secret Service (SS) to create temporary restricted areas around certain federal protectees.

138. The use of the § 1752 statute required constant deception and fabrication of claims and evidence by DOJ prosecutors. Knowing that the Secret Service had never formally "restricted" the Capitol on January 6, and knowing that any designations or indications were insufficient, Garland and Graves' prosecutors retreated to a contrived argument that the Capitol Police had restricted the Capitol on January 6 on behalf of the Secret Service.[33]

139. While the D.C. Circuit later upheld this artifice,[34] at trials of J6ers, prosecutors presented a preposterously large, "restricted area" concept map around a single protectee (Vice President Mike Pence) (who was as far as a half-mile or more away from most J6ers at any given time).[35]

140. Garland and Graves' use of § 1752(c)(1)(B) yielded absurd results. For despite the Garland DOJ's concocted claim that the Capitol Police were proxies for the Secret Service in "restricting" the Capitol on January 6, the Garland DOJ simultaneously argued that the Capitol

[33]At J6 criminal trials, GARLAND and GRAVES (DOJ) presented nothing but a memo announcing a construction closure on the west side and a series of emails announcing the scheduled movements of V.P. Pence as supposed evidence of the "restrictions."

[34]United States v. Neely, No. 23-3166 (D.C. Cir. Dec. 27, 2024) (affirming J6 defendant Darrell Neely's conviction under 18 U.S.C. § 1752(a)(1) despite the fact that the restrictions had not been designated solely by the Secret Service).

[35]Note that for a year, the first J6 indictments falsely alleged there were TWO Secret-Service protectees at the Capitol: Kamala Harris and Mike Pence. But it was finally revealed that Kamala Harris had been at the DNC headquarters during the time and not at the Capitol. Upon information and belief, government officials had secretly staged a false flag operation involving Kamala Harris and government-placed "pipe bombs" at the DNC. But for reasons unknown, these government officials had canceled the scripted pipe bomb event or altered their intended storyline. Of course, this means that for an entire year, the United States presented false statements and fabricated evidence to grand juries regarding the location of V.P.-Elect Harris. Throughout 2022, the DOJ returned to the grand juries to obtain superseding indictments to correct this false information. The Secret Service deleted all text messages relating to these matters so as to obscure the truth.

Police had no authority to 'unrestrict' any area of the Capitol, such as by opening doors, opening barricades, or inviting J6ers into the Capitol.

141. Certain unknown officers of the Secret Service were also part of the conspiracy to knowingly and deceptively delete all text messages relating to the matters of January 6, to prevent the Plaintiffs and the public from knowing the truth and to assure that the evidence was not available to those charged for violations of law.

142. As a result, many innocent J6ers (including many of the Plaintiffs) were wrongly convicted through trickery as well as entrapment.

143. Thus, each J6 criminal prosecution was a collection of planned absurdities and fabrications. In J6 trials, prosecutors were also part of the conspiracy. They asserted that the mere presence of whiffs of smoke or pepper spray or sounds of alarms ringing, or even the sight of rolls of plastic fencing lying on grass nearby was proof of the mythical "restrictions."

144. There is no way that the prosecutors, under Graves' supervision, did not knowingly deceive jurors and judges by emphasizing signs which were not seen by individual J6ers, but which had been erected and then taken down hours before J6ers arrived, or were hundreds of yards away, or lying on the ground.

***They Were Out to Destroy J6ers***

145. This was all part of the plan to repress the J6ers and the other waves of concerned Americans who would have followed. The plan was to cause as much harm to all J6ers, including the Plaintiffs, as possible, to destroy their lives in every way possible. The point was to make examples of the J6ers and blame them for being rioters and insurrectionists so that they would lose all credibility and their freedom to continue to protest. This was the leading edge of stemming opposition to the rigged election. Worse, the plan worked.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

146. While the J6ers were on the grounds, Metropolitan Police used percussion grenades, rubber bullets, teargas, and ultimately CS Gas on the J6ers, and sprayed them in the face with pepper spray as they pushed them into the Capitol Building.

147. Then, months later, instead of making peaceful arrests, where J6ers would have surrendered themselves voluntarily, even where J6ers offered through counsel to be voluntarily arrested, the conspiracy dictated to do the most harm possible by smashing in the front doors of their homes in the early morning hours and then pulling them all out of their houses sometimes in frigid weather in their underwear and then holding them at gunpoint. Parents who had to stand were almost paralyzed for hours while their homes were ransacked as they stood watching the red dots from the laser sights of the guns and rifles on the chests of their children.

148. The misuse of the court system was to an extent where the District Court Judges and Magistrate Judges in Washington, D.C., became either wittingly or unwittingly part of the whole conspiracy.

149. For those who were imprisoned, in many circumstances, they were put in solitary confinement for extended periods because they were J6ers. In many circumstances, prison populations were falsely told that the J6ers were white supremacists, and prison guards were falsely advised that the J6ers were responsible for the deaths of 5 police officers.

150. Every effort was made to destroy the lives of as many J6ers as possible and give them the harshest of all possible prison existences.

***The Government's Misuse of 18 U.S.C. § 1512(c)(2)***

151. Merrick Garland's Department of Justice also maliciously utilized a felony punishable by 20 years' imprisonment, "obstruction of an official proceeding" under 18 U.S.C. §



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

1512(c)(2) to punish J6ers who refused to immediately plead guilty to lesser charges, among other things.

152. From January 7, 2021, to January 20, 2025, Wray, Garland and Graves maliciously prosecuted many of the Plaintiffs with the bogus charge, "obstruction of an official proceeding" under 18 U.S.C. § 1512(c)(2), without probable cause.

153. The statute was drafted by Congress as part of the Sarbanes-Oxley Act of 2002 following the accounting and auditing fraud revelations involving Enron and Arthur Andersen LLP. The legislative intent of the Act was that it was supposed to apply to evidence-destruction, bribery, or witness tampering associated with corruptly influencing official proceedings, resulting in erroneous outcomes.

154. Conspiracist Garland's prosecutors deployed the statute as an extremely punitive disorderly conduct law and a tool for compelling innocent J6ers to plead guilty to crimes they didn't commit. Prosecutors admitted that they used the same evidence for § 1512 prosecutions as they did for misdemeanor disorderly conduct prosecutions. However, they used the threat of § 1512 prosecutions to punish J6ers who defended themselves.[36] Moreover, the chilling shockwaves

[36]At least three dozen J6ers (at least 66 percent of all alleged misdemeanants who demanded trials) were charged with the bogus felony charges when they turned down misdemeanor plea offers. Tommy Frederick Allan, John D. Andries, Stephanie Baez, and Richard Barnett were charged with misdemeanors and then charged with felonies in superseding indictments. (Sentenced to 45 mos.) Damon Michael Beckley, James Bonet, Larry Brock, Therese Borgerding, Dominic Box, Sara Carpenter, Jenny Cudd started with two misdemeanors, which were quickly superseded with felony charges when Cudd indicated she would defend herself. David Davis, Derrick Evans, Simone Gold, Daniel Goodwyn, Derek Gunby, Brian Gundersen, Joseph Irwin, Leo Kelly, Deborah Lee, Larry Ligas, Kevin James Lyons, and Patrick Montgomery all had similar experiences. Darrell Neely was initially charged with 5 misdemeanors; those charges were then superseded by felony § 231 counts after declining plea offers (ultimately acquitted at trial of the felony § 231 count). Michael Oliveras was charged with 4 standard misdemeanors on 12/8/21. A year later, after rejecting a plea, Oliveras was charged with a felony § 111 assault charge, ultimately sentenced to 5 years. Nicholas Rodean was charged with misdemeanors on 01/29/21 and then indicted on March 19, 2021, with § 1512 and felony destruction of property charges.

of these vindictive charging decisions reverberated throughout the J6er community, causing many innocent J6ers to falsely plead guilty to crimes they didn't commit.

155. On June 28, 2024, the Supreme Court held that, to prove a violation of § 1512(c)(2), the Government must establish that "the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in an official proceeding, or attempted to do so." Fischer v. United States, 603 U.S. 480 (2024).

---

Mark Sahady was charged with misdemeanors until rejecting a plea; then his misdemeanors were superseded with a § 1512 charge. Grayson Sherrill was charged with 4 standard misdemeanors on 04/06/21, which were then superseded on 12/15/21 with several felonies. Hatchet Speed was charged with 4 standard misdemeanors, then hit with a § 1512 charge after rejecting a petty misdemeanor plea offer. Christopher Spencer was charged with 4 standard misdemeanors on 02/23/21, which were superseded with a § 1512 charge on 03/10/21. Yvonne St. Cyr was charged with two misdemeanors on Feb. 12, 2021, offered a probation plea deal and hit with two felony § 231 charges in May 2022 upon rejecting an offer. St. Cyr was convicted on all counts by jury in March of 2023 and sentenced to 30 months in prison. John Strand was charged with two misdemeanors and then with additional § 1512 counts. He was offered a misdemeanor "entering and remaining" deal but rejected it. (Codefendant Simone Gold accepted and got 60 days.) Strand got 32 months in prison. John George Todd III was charged with the four misdemeanors for two years and then, just nine days before trial after rejecting a plea offer, was charged with a 20-year-felony, 18 U.S.C. § 111(b) assault causing bodily injury (officer cut his own finger inside the Capitol while tugging at Todd's tiny fiberglass flagpole). Later, prosecutors added a § 1512 obstruction charge after Todd asserted privilege to testify before the grand jury. Todd was ultimately sentenced to a 5-year prison term. Anthony Robert Williams was charged on 3/24/21 with 4 misdemeanors; those charges were superseded on 5/26/21 by a § 1512 charge, and Williams was ultimately sentenced to 5 years' imprisonment. After Fischer nullified Williams' conviction, DOJ vindictively superseded again with a felony § 231 charge on 12/18/24. There are also a handful (e.g., Nicholas DeCarlo, Nicholas Ochs, Robbie Norwood, and Williams (above)) who briefly overturned their felony convictions (due to the Supreme Court's Fischer decision) and then were poised for release or retrials on misdemeanors—only to be charged with other superseding felony charges. This list is substantially larger than the number of J6ers who were allowed to have misdemeanor trials (reported to be around 23). See Michael Kunzelman, "To plead or not to plead? That is the question for hundreds of Capitol riot defendants," AP News, Jan. 5, 2024, https://apnews.com/article/capitol-riot-anniversary-sentencing-data-c0a60a2ba68a70645bd5f9e5bcc45324 (accessed 10/25/2025).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***Garland's DOJ Weaponized the Use of Vindictive Superseding Indictments To Punish J6ers Who Insisted on Their Constitutional Rights.***

156. The vast majority of J6ers were initially prosecuted for misdemeanors. However, there were only 23 misdemeanor J6 trials. This is because (1) the vast majority (over 66%) of J6ers who insisted on misdemeanor trials were denied such trials and were instead charged with bogus superseding felonies, and (2) other J6ers, aware of the DOJ's insidious practice, falsely pled guilty to crimes they did not commit in order to save their lives and careers.

157. J6 criminal defense lawyers frequently reported that their J6 clients were offered "petty" misdemeanor offers, meaning the J6ers were invited to plead guilty to offenses punishable by under 6 months' jail time. However, when the J6ers rejected such offers, as a matter of course, they were punished with 20-year-felony charges.[37]

158. No previous court case (including those which reversed convictions and struck down prosecutions) had ever considered anything near a 40-to-1 ratio of vindictive charge escalation.[38] Even twice is abusive, let alone 40 times!

---

[37]See, e.g., Josh Gerstein & Kyle Cheney, "Two federal prosecutors were placed on leave hours after describing Jan. 6 as an attack by 'a mob of rioters.'" Politico, Oct. 30, 2025, https://www.politico.com/news/2025/10/30/sentencing-memo-january-6-attack-00631013 (accessed 11/21/2025) (saying "defense attorney Carmen Hernandez said Taranto was only facing charges over the 2023 incident because he turned down an offer last year to plead guilty to misdemeanor charges related to the J6 riot."). See also the September 2024 interview of Brian Korte on the Brian Lupo show "Inside J6 w/J6er Brian Korte," Inside J6 with Brian Lupo, Sept. 18, 2024, https://rumble.com/v5fgsfp-inside-j6-w-j6er-brian-korte.html (accessed 11/24/2025) (saying J6er Brian Korte pleaded guilty to four standard misdemeanors after being threatened with prosecution under § 1512).

[38]Compare North Carolina v. Pearce, 395 U.S. 711 (1969) (invalidating two convictions: Pearce, convicted of assault with intent to rape and sentenced to 12 years and then later given an 8-year term without credit for time served after winning an appeal; and Rice, sentenced to 10 years for burglary but then given 25 years after winning his appeal). Blackledge v. Perry, 417 U.S. 21 (1974) (finding due process violation where defendant sentenced to 6 months for misdemeanor assault was given 5–7 years for felony assault with a deadly weapon with intent to kill (over the same facts), after appealing). Bordenkircher v. Hayes, 434 U.S. 357 (1978) (defendant rejected 5-year plea offer and was then indicted as career offender and sentenced to life imprisonment); United



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***A Machine for Generating Guilty Pleas***

159. Above all, the government's practice of steep charge escalation was a machine for generating guilty pleas, including false guilty pleas. It wasn't long before J6ers began to pronounce that they were being railroaded into pleading guilty to crimes they did not commit, being forced to submit to avoid the threatened lengthy prison sentences.

***Misuse Of 18 U.S.C. § 231 and Brady Violations To Conceal Economic Prosperity Brought by J6ers***

160. Prosecutors also maliciously misused the federal rioting statute, 18 U.S.C. § 231, which criminalizes resistance to authorities during "civil disorders" which "affect commerce." Congress obviously contemplated that the statute would apply to typical riots with property damage, looting and arson in mind. Yet in J6 prosecutions, Garland's Justice Department concealed and withheld evidence that J6ers had boosted the local D.C. economy, bringing profitability to the city's hotel and restaurant industries which hadn't been seen for months beforehand and afterward.

***A Systematic Program of Vindictive Prosecution***

161. Under conspirators Garland and Graves, vindictive prosecution became a science. There were 23 misdemeanor J6 trials. However, at least 35 accused J6er misdemeanants who demanded trials were punished with felony charges instead. This means that at least 66% were denied their constitutional right to trials.

---

States v. Goodwin, 457 U.S. 368 (1982) (involving an offer of petty assault (up to 1 year), which became assaulting a federal officer (up to 8 years), upon rejection of the offer).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***The Biggest Mass Brady Violation in Legal History***

162. Although prosecutors are under constitutional obligations to disclose exculpatory evidence, conspirators Garland, Graves, and their underling prosecutors knowingly withheld the most basic exculpatory evidence from accused J6ers, including evidence that refuted central features of their false allegations, including:

a. Evidence that the DOJ had been carefully planning the J6 event since at least August 2020[39] and had planted hundreds of undercover government operatives and agents amidst the[40] crowds on January 6. The United States concealed the information for years. Then FBI Director Wray, in furtherance of the conspiracy to take over America, lied and lectured congressmen for accusing the FBI of planting informants or agents inside the massive crowd of Trump supporters on January 6. In a bold statement that directly contradicts multiple official sources, FBI Director Christopher Wray falsely testified before Congress in July 2023 that he "does not believe" undercover FBI agents were present at the U.S. Capitol on January 6. Those lies were finally revealed in September 2025 when facts showed there were 274 undercover FBI

[39] See John Solomon and Steven Richards, "FBI Secretly Prepared for Disputed Election and Political Violence in 2020, Bombshell J6 Memos Show," Just the News, Feb. 9, 2026 (saying the FBI conducted a tabletop exercise in summer 2020 that led to development of strategies like undercover informants and mass prosecutions for minor crimes that it would later use with the Jan. 6 Capitol riot).

[40] Documents were declassified on September 25, 2025, which revealed that there were some 274 undercover plainclothes FBI agents among the crowds on January 6. This withheld evidence led criminal defendants (and defense attorneys) to falsely plead guilty or counsel J6ers to falsely plead guilty. In furtherance of their conspiracy to rig the 2020 Presidential Election and to take over the government of the United States, former FBI Director WRAY lied and concealed this information for years and lectured House Republicans for accusing the FBI of planting informants/operatives/agents inside the massive crowd of Trump supporters on January 6, 2021. In a bold statement that directly contradicted multiple official sources, FBI Director Christopher Wray testified before Congress in July 2023 that he "does not believe" undercover FBI agents were present at the U.S. Capitol on January 6.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

at the scene, after hundreds of J6ers had been misled into falsely pleading guilty to crimes they did not commit.

b. Evidence showing the United States' claims of "140 officer injuries" were bogus and exaggerated, and that the most serious injury suffered by any officer on J6 was a broken finger.

c. Evidence from pre-event and post-event meetings acknowledging exculpatory and material facts (including wrongdoing and excessive force by police which stoked J6 violence).

d. Evidence of the presence of hundreds of armed, filming, recording, plainclothes agents on J6.[41]

e. Evidence from a team of undercover Capitol P.D. officers positioned above the west front lines, filming the action below. These officers would go into the Capitol, and at the end of the day they filmed curfew arrests. However, the government has not produced everything they recorded.

f. Evidence of officers committing police brutality against J6ers on a massive scale, which would have altered the United States' public J6 narratives.[42]

---

[41]As it turns out, hundreds of plainclothes FBI agents filmed J6 events and recorded their and others' expressions, excited utterances and present-sense impressions which would have been exculpatory for many J6ers. Upon information and belief, these withheld recordings would have likely shown that the Capitol grounds were not as restricted as government trial testimony had claimed. Yet these many recordings were hidden and withheld from J6 defense counsel.

[42]One notorious example involves footage of officers kidney-punching a J6er over a dozen times as the J6er cried in anguish. The officer hurt his hand. The full footage was initially posted on http://Evidence.com. Then on Christmas Night, Dec. 25, 2021, at 9 p.m., the footage was removed, and an edited version replaced it. The video abruptly ended before the beating. The notes by the investigator stated unambiguously that "The BWC was rattled, causing the Body Worn Camera to be shut off." Then, a NEW video popped up, where the beating had ended, but the BodyCam footage resumed. See also https://x.com/FreeStateWill/status/1693613732633460866 (accessed 6/3/2026) (showing the second gap in McAllister's footage occurred in the tunnel as he and Lt.

g. Evidence of the presence of large numbers of Antifa and Black Lives Matter rioters who instigated aggressive and offensive conduct for which innocent Trump-supporting J6ers were accused.

h. Text messages and other communications by U.S. Secret Service about the events of January 6, including “pipe bomb” claims, the movements of Trump, Pence, and Harris, and the falsity of restricted areas at the Capitol.

163. Nondisclosure of the evidence that J6 prosecutions had been staged, set up, and planned in wargaming and tabletop exercises months in advance also concealed that the J6 prosecutions were a conspiracy, administratively planned in advance, rather than legitimate acts of court advocacy in response to crimes. Not only did this withheld evidence keep J6ers from proving entrapment, but the evidence showed planning to entrap J6ers, in advance, by the United States and its officers.

164. As a consequence of the United States’ withholding this exculpatory evidence, many defense lawyers counseled J6ers to falsely plead guilty. Those J6ers who went to trial, including some of the Plaintiffs, became wrongly convicted of crimes they did not commit.

***DOJ’s Pattern of Vindictive Escalation of Charges and Penalties For the Plaintiffs Who Tried to Defend Themselves***

165. As described above, some of the Plaintiffs were initially charged with just misdemeanors. However, when they rejected petty-misdemeanor (i.e., up to 6 months’ imprisonment) plea offers and exercised their right to trials, the Garland Justice Department punished them with felonies in retaliation and without probable cause. In most cases the Garland

---

Bagshaw were beating the defenseless Victoria White in the head. For both gaps, McAllister’s camera did not beep (as normal) when the recording resumed less than a minute later (thus showing the footage was likely edited by prosecutors after obtaining the video from officers)).

Justice Department charged alleged misdemeanants with 20-year felonies. This 40-to-1 ratio was the most extreme ratio of escalation ever registered in any case in the history of federal courts.[43]

166. Almost all J6ers who demanded trials received prison sentences. In fact, the majority of J6ers who were initially charged with misdemeanors found themselves facing additional felony charges when they exercised their constitutional right to trials. This occurred amongst a jury pool composed of more than 90% Democratic voters where the jury conviction rate for J6ers was 100 percent. Prison sentences for J6ers who demanded trials on felonies averaged two years longer than sentences of J6er felons who pled guilty.

167. This landscape of steep charge escalation and punishment led many J6ers to denounce the prosecutions and publicly proclaim they were wrongly convicted. In response, the DOJ threatened further retaliation against them.

168. Judges such as Chief Judge Beryl Howell explicitly agreed with the government's retaliatory charging of J6ers who turned down plea offers. Chief Judge Howell even excoriated a federal prosecutor who failed to add felony charges against a J6er who insisted on a misdemeanor trial.[44]

---

[43]No previous court case (including those which reversed convictions and struck down prosecutions) had ever considered a 40-to-1 ratio of vindictive charge escalation. Compare North Carolina v. Pearce, 395 U.S. 711 (1969) (invalidating two convictions: Pearce, convicted of assault with intent to rape and sentenced to 12 years and then later given an 8-year term without credit for time served after winning an appeal; and Rice, sentenced to 10 years for burglary but then given 25 years after winning his appeal). Blackledge v. Perry, 417 U.S. 21 (1974) (finding due process violation where defendant sentenced to 6 months for misdemeanor assault was given 5–7 years for felony assault with a deadly weapon with intent to kill (over the same facts), after appealing). Bordenkircher v. Hayes, 434 U.S. 357 (1978) (defendant rejected 5-year plea offer and was then indicted as career offender and sentenced to life imprisonment); United States v. Goodwin, 457 U.S. 368 (1982) (involving an offer of petty assault (up to 1 year), which became assaulting a federal officer (up to 8 years), upon rejection of the offer).

[44]In the case of United States v. Todd, Chief Judge Howell scolded a prosecutor for making her have a trial on misdemeanors. When the federal prosecutor responded that the DOJ had searched



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***The Government Turned J6 Sentencing Hearings Into Pageants of Exaggeration, Fabrication, and Blood Lust***

169. In every case where J6ers sought to raise funds for their legal defense, the Government demanded that every penny raised be seized as punitive fines and turned over to the government. J6ers had difficulty finding public defenders who would zealously defend them.

**The DOJ Monitored Social Media, Seeking to Silence and Punish Attempts by the Plaintiffs and Their Attorneys To Alert the Public Regarding These Injustices.**

170. Under the Constitution, an accused has a First Amendment, Fifth Amendment (due process), and Sixth Amendment (fair trial/counsel/defense/confrontation) right to alert the public regarding injustices in the federal courts. Accused persons also have a constitutional right to plead for help in defense. The public also has First and Sixth Amendment rights to be informed of injustices and to donate funds to fight injustice. However, Garland's Department of Justice scoured through J6ers' social media posts to identify memes, statements, podcasts, or interviews by each J6er regarding the prosecutions. Prosecutors filed pleadings to punish those J6ers who tried to alert the public regarding their treatment. Federal prosecutors even filed documents to sanction criminal defense lawyers who alerted the public about the unjust prosecutions.

171. The rigging of the 2020 Presidential Election which was followed by DOJ prosecutors imprisoning J6ers and attempting to keep the wrongful arrests, fines, and imprisonment secret from the public was in furtherance of the true insurrection which had rigged the election.

---

for felony charges to bring against Mr. Todd, Chief Judge Howell warned the prosecutor that he was "running out of time."



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***Fabricated Sentencing Enhancements to Increase J6er Sentences***

172. In almost every trial where any J6er testified in his own defense (often because the J6er was forced to, because the DOJ systematically intimidated defense witnesses or precluded J6ers from presenting defense arguments unless the J6ers took the witness stand), the Government claimed the J6er lied during the testimony—invariably pointing at some subjective question—and then demanded a two-point sentencing enhancement for 'committing perjury.'

***Property Returned Damaged, Broken and Missing.***

173. Upon their release from the malicious charges, the Plaintiffs sought the return of property which had been seized by the FBI during their cases. The FBI returned their property damaged, missing and/or broken. The FBI returned cell phones and computers to J6ers with hard drives and files destroyed or missing.

174. The hard drives and SIM cards were missing probably because the Government withheld, hid, or destroyed them. Those drives and SIM cards contained images and videos taken on January 6 which refuted and debunked the Government's bogus narratives. Thus, these acts of damage and theft constituted Brady violations as well as takings and/or negligence.

175. Some of these items were already damaged before seizure, as described in the individual client sections below.

***The AUSA Prosecutors Who Were Part of the Conspiracy To Commit and Cover Up the Insurrection and Treason***

176. The following are some of the prosecutors who conspired to act beyond the bounds of the law to bring injustice as the way of the U.S. District Court in the District of Columbia:



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

a. Merrick Garland, the U.S. Attorney General who supervised, guided and directed the grave national injustice herein described.

b. Matthew Graves (U.S. Attorney for D.C.), who implemented and imposed these abuses in the District of Columbia.

c. Greg Rosen, Chief of the Capitol Siege Section who oversaw the Capitol Siege Section, supervising hundreds of abusive prosecutors and J6 investigations. He supervised more than 1,000 prosecutions, trained and managed over 200 prosecutors and staff, and coordinated the abusive investigation and litigation from grand juries through trials and appeals.

d. Jeffrey Nestler, an Associate Deputy Attorney General at the U.S. Department of Justice, used blatant perjury in his rigged J6 trial of Oath Keepers. Mr. Nestler also concealed and withheld the evidence that would have exposed government perjury during the trial.[45]

e. Jocelyn Ballantine supervised numerous abusive and malicious J6 prosecutions. Ms. Ballantine and Assistant U.S. Attorney Jason McCullough approached Proud Boy leader Enrique Tarrio with a cooperation deal around October 2022 in which the government promised Mr. Tarrio's immediate release if Tarrio would falsely say that Donald Trump had directed the Proud Boys on J6. Ms. Ballantine is presently pursuing wrongful prosecution against an innocent black man to cover up the role of the government in the government's "pipe bomb" affair.

---

[45]Blaze Media's October 2023 investigation found that witness David Lazarus's trial testimony was contradicted by extensive Capitol CCTV footage. Although Lazarus claimed to witness a hostile encounter between Officer Dunn and Oath Keepers, analysis showed Lazarus was in a Senate office building when the encounter began and did not arrive at the scene until three and a half minutes after the last Oath Keepers had left the area. Officer Dunn's testimony also appears to have been inconsistent. Initially, he claimed Oath Keepers had de-escalated the situation, but his later accounts portrayed them as aggressors.

f. Brendan Ballou, an Assistant U.S. Attorney (AUSA) who prosecuted several J6ers with sadistic zeal. Mr. Ballou fought for jury instructions that said there were no First Amendment rights at the U.S. Capitol.

g. Ashley Akers prosecuted dozens of January 6 defendants, with a focus on exaggerated claims of "assault" on law enforcement officers. She perfected the art of vindictively prosecuting accused misdemeanants with felonies when they demanded trials. She presided over the Chris Quaglin investigation, where agents told a J6er he would never see his family again unless he testified against fellow J6ers.

h. Kyle M. McWaters was a leading orchestrator of escalated 20-year-felony charges against J6ers who turned down misdemeanor plea offers. Mr. McWaters refused to dismiss a false § 1512 conviction of J6er Hatchet Speed even after the Supreme Court struck down the use of the statute as a disorderly-conduct substitute.

i. Michael Gordon, an AUSA who used his status to abuse J6ers. In at least one case, Mr. Gordon argued that J6ers who carried flags were committing assault with a deadly weapon because a plastic flagpole might poke someone's eye out.

j. Sean Murphy, a particularly cruel prosecutor who vindictively and relentlessly prosecuted such J6ers as Stephanie Baez with a bogus § 1512 charge when Baez insisted on her right to a trial. Even after the Fischer decision, Mr. Murphy refused to drop the false charge against Baez. Ms. Baez was hospitalized from stress and suffered several miscarriages during the ordeal. Ms. Baez was finally acquitted of the vindictive bogus charge at trial.

k. Sam White vindictively charged J6ers such as Derek Gunby with false "obstruction of official proceeding" charges when they wouldn't plead guilty to misdemeanors.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

l. Alexis Loeb, like others in the conspiracy, used her position to vindictively increase charges against J6ers who wouldn't plead guilty. As former Deputy Chief of the Capitol Siege Section, Ms. Loeb played a senior leadership role in coordinating the section's abusive and malicious prosecutions.

m. Lisa Monaco, deputy Attorney General from April 2021 to January 2025, publicly framed January 6 as an "attack on our democracy." Ms. Monaco emphasized the heavy use of inapplicable felonies like 18 U.S.C. § 1512(c)(2) ("obstruction of an official proceeding") for many non-violent entrants. Under Ms. Monaco's direction, J6 prosecutions peaked before the 2022 and 2024 elections. Ms. Monaco also tried to pressure J6er James Giannakos into falsely saying the Proud Boys had followed Donald Trump's directions on January 6.

n. Barry Disney vindictively and maliciously added two 20-year felony charges (§ 1512 and § 111(b) "assaulting an officer, causing bodily injury") against a J6er when the J6er testified before the grand jury in his defense. (The bogus "assault" charge was fabricated upon an officer's finger cut when the officer pulled on the J6er's fiberglass flagpole on J6.)

o. Samantha Miller used Brady violations and false police testimony to obtain convictions against a J6er.

p. Francesco Valentini stalked social media accounts of J6ers and their lawyers to punish those who criticized the unjust prosecutions.

177. These prosecutors overcharged many participants in the J6 protest and weaponized the Justice Department by holding defendants in pretrial detention, imposing lengthy delays, and denying due process and exculpatory evidence to J6ers.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***The District Court Judges Who Participated***

178. The following are some of the District Court judges who participated in acting beyond the bounds of the law to bring injustice as the way of the U.S. District Court in the District of Columbia:

a. Judge Beryl Howell was the chief judge of the District of D.C. until mid-2023. Judge Howell worked hand in hand with federal prosecutors in the escalation of misdemeanor cases into felony cases when J6ers demanded trials. Judge Howell also aided federal prosecutors in concocting diminished rights to pre-trial release for J6ers in plain contradiction of settled appellate precedent. In fact, she inserted herself to overrule all decisions in which Magistrate Judges in at least 17 different courts followed the law to release J6ers who were charged with J6 offenses based on criteria of law which did not apply. This included cases involving, but not limited to, Tom Ballard, Richard Barnett, Jeffrey Scott Brown, Lisa Eisenhart, Eric Munchel, Scott Fairlamb, Doug Jensen, Cody Mattice, Timothy Hale-Cusanelli, Ronald McAbee, Brian Mock, Ethan Nordean, Christopher Quaglin, Zachary Rehl, Thomas Sibick, Jack Whitton, and Christopher Worrell. Judge Howell was the main protagonist who led the judges of the District Court of the District of Columbia, and knowingly and intentionally was intent on removing Donald J. Trump from office by concealing the rigging of the Election. Her conduct and that of the judges who follow in this section need to be examined by the Department of Justice and if applicable, they should be prosecuted for their complicity in the conspiracy to commit treason.

b. Judge Emmet Sullivan who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

c. Judge Trevor McFadden who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

d. Judge Rudolph Contreras who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

e. Judge Reggie Walton was particularly cruel in imposing supposed "COVID"-related mask and vaccine restrictions on J6ers. Judge Walton knew that prospective jurors who disdain mask and COVID vaccine rules tended to be skeptical jurors who might also be skeptical of the bogus J6 prosecutions. So Judge Walton prohibited unvaxxed jurors in order to tilt trials in favor of the prosecution.

f. Judge Amit P. Mehta presided over numerous J6 prosecutions and ruled for the government on most pretrial and post-trial motions. Judge Mehta also pronounced that J6er motivations were lies because the 2020 election was "clearly" not stolen.

g. Judge Royce C. Lamberth claimed that "no evidence ever emerged" supporting Donald Trump's election criticism—despite ruling repeatedly that J6ers could never present such evidence.

h. Judge Amy Berman Jackson referred to J6ers' election integrity motivations as "the lie that the [2020] election was stolen" despite repeatedly denying J6ers the opportunity to show their good faith regarding the issue.

i. Judge Tanya Chutkan, who handled Trump's federal election case and many J6 sentencings, described the protest as a riot fueled by "baseless claims of a stolen election" despite Judge Chutkan's denial of every attempt to support the stolen-election claims with evidence. Because the issue of "corrupt intent" was an element required for conviction under 18 U.S.C. § 1512 obstruction, this denial of opportunity to present evidence was a fundamental due process violation. Moreover, the government's withholding of such evidence was not just a discovery violation but a Brady violation.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

j. Judge Timothy Kelly helped the government conceal evidence of FBI misconduct, including evidence that Agent Nicole Miller and her team destroyed evidence, unlawfully recorded attorney/client communications and sought to break up the marriage of J6er Zachary Rehl.

k. Judge Thomas F. Hogan made it public that the J6ers committed an "insurrection that was probably the worst thing that's happened to our democratic way of life in our history." He continued ruthlessly with his bias.

***The Magistrate Judges Who Participated***

179. The following are some of the Magistrate Judges who conspired to act beyond the bounds of the law to bring injustice as the way of the U.S. District Court in the District of Columbia:

a. Magistrate Judge Moxila A. Upadhyaya processed many J6 cases while applying the tilted rules of the other judges of the District (e.g., protective orders to prevent public awareness, pretrial rulings precluding the First Amendment and entrapment defenses, evidentiary rulings allowing prosecutors to show evidence of violence throughout the Capitol while narrowing J6ers' evidence to things immediately seen). Magistrate Judge Upadhyaya presided over J6 cases despite having previously represented clients who were deposed or were major players in Dominion Voting machine litigation cases involving the 2020 presidential election.

b. In fact, it is on information and belief that she personally represented the president of Venezuela who was the one who perpetrated the scheme of rigged election equipment on the United States. She had been asked to disqualify herself, and she always refused. Judge Upadhyaya had been the personal attorney for the head of the snake selling computer election results in America. She stayed on cases knowing full well that she was deeply conflicted out and



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

was one of the harshest and worst judges of all. She also stays as Magistrate Judge on the matter of Dominion Machines v. Byrne, and she is so totally conflicted; it leads to a conclusion that she is aware and intentionally acting wrongfully. Her position leads to a conclusion that she is acting in furtherance of the wrongful rigging of the Election, making her probably guilty of participating in a conspiracy to commit sedition, insurrection, and treason.

c. Magistrate Judge Zia M. Faruqui presided over numerous J6er arraignments. At one misdemeanor J6 trial, Magistrate Judge Faruqui instructed a jury that all of the statutes involved were constitutional and that there were no First Amendment rights at the U.S. Capitol. Judge Faruqui imposed the heaviest fine in U.S. history for a misdemeanor, $103,000, upon a J6er who strode through open doors into the Capitol and walked around for under 10 minutes.

***Other Damages***

180. As a direct and proximate result of the Government's tortious conduct, each of the Plaintiffs suffered and continues to suffer losses in excess of $1 million, including but not limited to medical expenses, lost wages and income, pain and suffering, severe emotional distress, loss of liberty, reputational harm, and other consequential damages.

181. The Plaintiffs also suffered loss of consortium with their spouses. Husbands and wives abandoned them during these malicious prosecutions.

182. At least six J6ers committed suicide due to the trauma,[46] and many others attempted suicide during the ordeal.

[46] J6ers Mark Aungst, Christopher Stanton Georgia, Jord Meacham, David Kennedy Homol, and Matthew Perna took their own lives during the prosecutions.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

**The Atrocities Which Occurred In Prison**

183. When J6ers were incarcerated in jails and prisons, they were subjected to additional abuse. J6ers were forced to surrender DNA samples, even if held on mere nonviolent misdemeanors. J6ers who refused to submit to experimental COVID-19 vaccine injections were denied attorney visits and held in solitary confinement for extended periods. They were also denied haircuts and shaving privileges.

184. J6ers were also denied access to their discovery to prepare for trials. In some cases, defense attorneys who came to the jails in D.C. or Alexandria to show or provide digital discovery or video files to J6ers were turned away by jail authorities multiple times. And in some cases, incarcerated J6ers were never allowed to see their discovery—the evidence against them—until they were in trial.

185. J6ers were denied medical care and treatment throughout the federal prison and jail system. J6ers such as Bart Shively and Christopher Worrell were denied cancer treatment, causing their cancers to grow out of control. Mr. Shively died shortly after his release from prison.

186. The FBI also monitored attorney-client communications of J6ers and used information gathered in such illicit surveillance to strengthen their prosecutions against J6ers.

**A Case In Point**

187. For purposes of explanation, one J6er has been chosen to explain what happened to innocent people on J6 and thereafter. Ryan Zink was a campaign photographer for his father, a candidate for Congress.

188. The Zinks made their way around the Capitol to the east side, following massive crowds. Shortly after 2 p.m., the Zinks heard a megaphone interaction between Capitol Police officers and protestors wherein a Capitol Policeman promised to see if he could get approval for



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

the crowd to move forward to the steps of the building. Minutes later the barricades were removed and the Zinks saw exuberant crowds rush forward to the east Capitol steps. Ryan saw a police officer literally waving people forward.

189. Ryan livestreamed as he and his father joined the crowd moving forward. Ryan hyped up the drama for his livestream audience, saying into his phone, "We're storming the Capitol!" When the Zinks got to the upper east balcony, they witnessed a young man kicking at windows. Ryan loudly shouted at the crowd to let police do their jobs and arrest the man. Seeing that the Zinks were protecting them, the officers asked Ryan to help give them space and record the incident. Moments later, the officers abandoned the arrest of the window kicker and moved away toward the main door. The Zinks eventually followed after the officers to photograph and livestream the scene at the door. When Ryan saw violence near the Capitol entrance, he and his father quickly made their way down the steps and back to their hotel.

190. Just days later, Ryan was awakened by flash bang grenades at his home in Amarillo, Texas. A large tactical team of counterterrorism officers kicked in his door and raided his rented property. He was charged with a 20-year felony, "obstruction of an official proceeding," and two misdemeanors. Although a local magistrate judge ordered Ryan released on pre-trial conditions, prosecutors and judges in D.C. teamed against him to appeal the ruling.

191. Ryan spent the next month in various jails, poisoned with rotten food and losing forty pounds from illness and distress.

192. As Ryan prepared for trial, he noticed that the DOJ deprived him of important discovery including the photos and video he had taken with his campaign camera. The DOJ provided only his Facebook livestream images, in which Ryan had dramatized the J6 events with hyperbolic "We're storming the Capitol!" statements.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

193. At trial, the officer who thanked Ryan and asked Ryan to record the event lied on the stand and said Ryan had gotten in his way on the balcony on J6. The officer who waved crowds forward to the Capitol testified that he was waving only at another officer.

194. Oddly, prosecutors provided a couple of images from Ryan's campaign camera in discovery. However, prosecutors withheld hundreds of other photographs. During trial, when Zink's attorney asked Judge Boasberg to order the prosecution to provide the seized camera footage, Judge Boasberg would not issue the order, saying Zink should have asked earlier, which he had. When Zink's counsel brought a flash drive to prosecutors for prosecutors to transfer the nondisclosed camera files, he untruthfully advised that the files had been deleted.

195. Later, at closing argument, a federal prosecutor told jurors that Zink had lied on the witness stand about being a campaign photographer on J6 and even told the jury that the (missing) camera images did not substantiate Ryan's defense.

196. Upon cross-examination, government witnesses admitted that no one inside the Capitol building could have possibly heard anything Ryan Zink had said to his livestream audience on his cellphone. Jeff Zink testified that even he could not hear what Ryan was saying to his livestream audience amid the roar of the crowd. Nonetheless, Mr. Zink was convicted of "obstructing an official proceeding" of Congress for making a few hyperbolic remarks into his cell phone while outside the Capitol.

197. Prior to sentencing, the Supreme Court invalidated the use of the § 1512(c)(2) "obstruction of an official proceeding" statute as a punishment for political demonstrators. Thus, Ryan faced sentencing for only two misdemeanors by the time of sentencing. Nonetheless, prosecutors requested maximum, consecutive sentences for the misdemeanors. Chief Judge



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Boasberg sentenced Mr. Zink to 90 days in jail, an outrageous sentence for a first-time offender who merely livestreamed his experience outside the Capitol and helped officers on J6.

198. Ryan Zink continues to suffer long-term injuries from the ordeal and his wife suffered several miscarriages due to emotional distress.

**Specific Allegations As To Each Plaintiff**

199. In each of the Plaintiffs' cases, the J6 criminal proceedings terminated in the Plaintiffs' favor, either by dismissal, acquittal on key counts, or executive clemency that nullified the convictions and restored the Plaintiffs' rights.

200. The prosecutions were initiated and pursued without probable cause, with actual malice, and for the improper purpose of politically persecuting the Plaintiffs because of their support for President Donald J. Trump and their exercise of constitutional rights. The following summarizes each Plaintiff's prosecution and its termination in their favor:

**Edward Roman Badalian**

201. The Plaintiff Edward Roman Badalian lives in Panorama City, California. Before January 6, 2021, he took part in the Beverly Hills Freedom Rally in Los Angeles County, and with his friend Daniel Rodriguez he had started a Telegram group chat for people who attended those rallies.

202. Unable to afford airfare, Mr. Badalian and Mr. Rodriguez organized a road trip to Washington for the President's rally on January 6. Six or seven people, among them an elderly man, an older woman and a young activist, shared the cost of a rented minivan, drove about thirty-three hours, and stayed at an Airbnb in Arlington, Virginia.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

203. Mr. Badalian got near the front for the President's speech. During the speech the group's walkie-talkies and phones died, and Mr. Badalian lost contact with the others. When the President told the crowd to march peacefully and patriotically to the Capitol, he walked there with the crowd. On the way he noticed a man dressed in black pushing toward the front without chanting or speaking to anyone, and he followed to see what the man was doing. He lost sight of him but ended up near the front of the crowd, and he ascended to the Lower West Terrace, near the window to the left of the tunnel.

204. There Mr. Badalian saw a man trying to break that window with a sledgehammer. Other demonstrators took the sledgehammer away from him, and people in the crowd shouted "Antifa" at the men breaking the window. When another man took up a wooden billy club and kept striking the window, Mr. Badalian pushed through the crowd and took the club out of the man's hand. The window breaker's companions attacked Mr. Badalian, pulled off his mask and hat, and shoved and pulled him to keep him from stopping their man.

205. Mr. Badalian then went to an acquaintance from the Beverly Hills rallies who was addressing the crowd with a megaphone and calling for patriots. He told her the window breakers were not with them and were trying to make the crowd look violent, and she changed what she was saying. He went to the edge of the terrace, where he could see a great crowd still heading toward the Capitol and realized there was no way around the building from where he stood. For ten or fifteen minutes he shouted and waved at the people below, telling them to go around the building. No one listened.

206. When Mr. Badalian returned to the window, it had been broken through. Men dressed in black and gray were inside, breaking furniture and handing pieces of it out through the window. He did not go in, because he knew that would be trespassing. By chance he met Mr.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Rodriguez there, for the first time in hours. Five or ten minutes later police launched gas grenades that burst behind them, trapping them between the gas and the window, and to get away from the gas they climbed into the room. The video the government later played against him shows them coughing as they came in.

207. Mr. Badalian was inside for about four minutes. He set fallen chairs upright, helped a man lift a cabinet back into place, and told the people in the room that they needed to find a way out. When an officer came to the window and said they were evacuating, he went to it at once, put his mask back on against the gas, and let the officer help him down. He apologized and told the officer that he had gone into the room only to escape the gas grenades. He apologized to each officer he passed on the way down the stairs. He later told the government and the court about that officer, but the government never produced the officer or his body-camera footage.

208. Mr. Badalian was exposed to pepper spray and tear gas that day. For several days afterward he had trouble breathing and his eyes burned. His clothes were so soaked with the gas that he had to throw many of them away. As police later cleared the grounds with gas and rubber bullets, he saw officers beating people who were doing nothing wrong.

209. On January 8, 2021, on the drive home, Mr. Badalian gave an interview to InfoWars describing the window breakers he had tried to stop. He used a pseudonym, but another person in the interview said his name. He believed he would be a witness against the people who had broken the window. He did not hide; he went home to Los Angeles and stayed there. Upon information and belief, the government used a geofence warrant against him. For days at a time, unfamiliar vehicles were parked on either side of the entrance to his apartment building, and they disappeared once his case was resolved. The FBI's "private" group called Sedition Hunters pursued him on Twitter and in person.

210. At about 3:00 a.m. on April 1, 2021, about twenty agents came to Mr. Badalian's apartment, kicking and pounding on his door and shouting his name. He went to the door in his underwear, told them he was there, and opened it slowly. Six men in forest-camouflage military uniforms had AR-15 rifles trained on his face. They shouted several commands at once, and as he tried to obey all of them, an agent grabbed him and slammed him into the stucco wall of the outside hallway, gashing his arm at the elbow. He still has the scar. The agents put a second set of handcuffs on him and tightened them until the blood was cut off from his hand and the cuffs pinched a nerve. When he told them the cuffs were hurting him, an officer answered, "I'll let you know when I care." They sat him beside the building's dumpster, in his underwear, in the cold.

211. The agents dragged Mr. Badalian's mother, who had been asleep, out of the apartment by her hair. They pointed their guns at Kaitlin, who was also in the home and could see the laser sights on her chest, and forced her out. After about an hour they brought Mr. Badalian back inside and questioned him. He told them what he had seen and done. The agents were interested only in other January 6 defendants. The warrant covered electronics, and the agents took his computer, his phone and his walkie-talkies. A young FBI agent told him his property would probably be returned in about two weeks. He was not arrested that day.

212. Mr. Badalian later attended a proffer session with the government and gave the same account, including descriptions of the people he had seen breaking the window and the furniture inside. The government wrote to his lawyer that he had provided no relevant information, and it then charged him. He was arrested in Los Angeles on November 17, 2021. At his initial appearance there he was taken to a United States Marshals facility downtown, where he was made to give a DNA sample and was fingerprinted and retina-scanned, although he had been convicted of nothing. At his detention hearing the prosecution argued that he was violent and should be held



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

without bail because he had taken the club away from the window breaker. The magistrate judge laughed at the argument, called it ridiculous, and released him. He remained on pretrial supervision for months.

213. Mr. Badalian paid his first lawyer $15,000 and let him go when the lawyer pressed him to plead guilty and left him to review the discovery himself. His trial lawyer charged $55,000, and to pay him Mr. Badalian's family took out a home equity loan.

214. The superseding indictment returned on November 17, 2021, charged Mr. Badalian, along with Mr. Rodriguez and another man, in United States v. Badalian, No. 1:21-cr-00246-ABJ-2 (D.D.C.), with conspiracy, obstruction of an official proceeding, tampering with documents or proceedings, and entering and remaining in a restricted building or grounds. He refused to plead guilty and was tried without a jury before Judge Amy Berman Jackson. During the trial the government threatened his lawyer with a superseding indictment. The government's witness on the tampering count did not support its account, and on April 4, 2023, the court acquitted Mr. Badalian of that count. It found him guilty of conspiracy, obstruction of an official proceeding, and entering and remaining in a restricted building or grounds. Outside the courthouse during his trial, Sedition Hunter Ryan J. Reilly tried to conduct an ambush interview of him.

215. After the verdict the court changed his conditions of release and put him on an ankle monitor for about seventy-five days before sentencing. A TSA officer at Los Angeles International Airport, seeing the monitor, asked what he had done to deserve it and told him it was the kind of thing used for terrorists. Mr. Badalian had to fly between Los Angeles and Washington for his case five times, on twenty-two connecting flights. His ticket was marked SSSS every time, and he was put through secondary screening, searched, and had his belongings gone through twelve times in front of other travelers.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

216. On September 26, 2023, the court sentenced Mr. Badalian to fifty-one months in prison and three years of supervised release, and imposed $2,000 in restitution and fines. It did not allow him to surrender. He was remanded from the courtroom in his suit, and the Marshals pulled him away from Kaitlin, who was crying, before he could hand her his phone and belongings. At the D.C. jail he was swabbed for DNA again.

217. Mr. Badalian spent about a month at the D.C. jail, the first eight days in quarantine under segregation-unit conditions, and then about two months at FDC Philadelphia, one of them in segregation. While he was in segregation there, his $150 radio went missing. Mr. Badalian believed that the correctional officer responsible for delivering inmates' property had discarded it. He was taken by air directly from segregation to Oklahoma, shackled at the ankles and waist. The prisoners were made to wait about an hour on the cold runway and were ordered out of the sun into the shade. The ankle chains cut his ankles as he climbed the stairs to the plane, and the prisoners had to hunch over in their belly chains to eat. At each transfer he waited hours in holding cells, once sleeping about eight hours on the floor.

218. After a few days at the Cimarron facility in Oklahoma and about three weeks in transit at Victorville, where a lieutenant ordered him to stop giving brief telephone interviews to podcasts or face charges, Mr. Badalian was sent to Lompoc. The low-security unit there was a former high-security penitentiary building with electronic doors and cells of about five by nine feet built for one man, into which a second bunk had been welded. He spent about eight months in one. His counselor there, a man named Peinado, mocked him in front of other staff when he said the President would pardon him, then took away his chair for two weeks at a time, and once, when Mr. Badalian came to ask him a question, told him to get out of his face or he would beat him. An officer whom Mr. Badalian believed was named Gutierrez initially said he lacked identification.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

After Mr. Badalian found and displayed his identification card and objected to the officer's treatment, the officer took him to the lieutenant's office, where he was strip-searched and held in a small holding cell for about an hour. At every facility he was retina-scanned and body-scanned, and in custody he was subjected to drug and alcohol testing.

219. Mr. Badalian paid another $15,000 for his appeal. After the Supreme Court's ruling on the obstruction statute in June 2024, and following the mandate of the court of appeals, the district court on September 16, 2024, vacated his convictions for conspiracy and obstruction, leaving only the misdemeanor, for which his sentence was twelve months in prison and twelve months of supervised release. He was released on September 17, 2024, after almost twelve months in prison. The prison would not let him collect his legal papers or the leather goods he had made by hand in the prison leather shop, and he was released with only what he had on him. After he won his appeal, the government again told his lawyer it would bring new felony charges against him, depending on the outcome of the election.

220. The government kept Mr. Badalian's custom gaming computer, worth about $2,500, for nearly four years. When it was finally returned in about February 2025, it had been taken apart, its components disconnected, and it no longer works. His passport was not returned for more than a year.

221. Mr. Badalian has been swatted. He has been banned from Uber, Lyft and Airbnb and from social media.

222. Mr. Badalian's prosecution terminated in his favor with the pardon of January 20, 2025, which pardoned his remaining conviction for entering and remaining in a restricted building or grounds. His convictions for conspiracy and obstruction had already been vacated on September 16, 2024. His computer was returned dismantled and no longer working, his radio went missing in

prison, and he believed the responsible correctional officer had discarded it. The government kept his passport for more than a year and never returned his legal papers or the leather goods he made in prison. His DNA remains in the government's possession.

**Andrew William Griswold**

223. The Plaintiff Andrew William Griswold lives in Florida with his wife. He works in construction. Shortly before the government charged him, he and his wife had opened a separate construction business through which they planned to bid on military construction contracts, and they had spent a good deal of money getting it ready to operate.

224. Mr. Griswold drove to Washington with a group of friends on January 5, 2021, checked into a hotel, and stayed overnight. The next morning they went to the rally at the Ellipse. People there were talking about going to the Capitol, and Mr. Griswold saw a man with a bullhorn working desperately to get the crowd to go there. He saw the same man later at the Capitol, still urging people on. When Mr. Griswold later told FBI agents about that man, the interview was cut off.

225. Before going to the Capitol, Mr. Griswold returned to his hotel to leave his flagpole and cooler backpack. He did not want anyone to mistake the flagpole for a weapon. He then walked back and rejoined his group.

226. As soon as Mr. Griswold reached the crowd at the Capitol, police began firing tear gas. Officers in full blacked-out riot gear came out from the building in groups, set upon one or two people at a time, and then walked back. Mr. Griswold recalls seeing officers let go of a man they had been holding on a ledge high on the building. The man, who was wearing a heavy backpack, fell what Mr. Griswold estimated to be about forty feet.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

227. Hit with tear gas again, Mr. Griswold moved to the side of the building with the steps and made his way up to a door with a friend, who was never charged. Someone inside opened the door, and people were being pulled in. Mr. Griswold had his hand on the right side of the door frame when a man inside dressed in full black gear reached out, took him by the left arm, and pulled him into the building. Mr. Griswold walked through, asked a police officer how to get out, and left.

228. On January 22, 2021, FBI agents came to Mr. Griswold's house looking to question him. He was at work; his wife was home. He retained a lawyer that same day, before he would go home, and paid a retainer of about $3,500.

229. On March 3, 2021, the FBI called Mr. Griswold and told him he had to come in that day. He was in Biloxi, Mississippi, finishing a construction job, and told the agents he could come in that Friday. When he asked whether he would be released that day or whether there would be bail, they could not tell him. On Friday, March 5, 2021, by arrangement through his lawyer, he surrendered to FBI agents at their field office in Pensacola and was arrested. The agents took both of his phones, swabbed him for DNA, fingerprinted him, and took the brand-new jacket he had worn on January 6, 2021. In questioning Mr. Griswold, FBI agents pressed him to say who he had been with. When he pointed out that they already had his location data and could see whose phone had been next to his, they insisted on hearing it from him. Mr. Griswold understood that the agents had his location data from January 6 and that confirming it was part of the reason they wanted his phones.

230. Mr. Griswold was then brought before a court. He had understood that he would be released that day, but the government said it was missing paperwork and would have to hold him



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

over the weekend until the paperwork arrived on Monday. His lawyer objected, and the judge refused to hold him, directed that the paperwork be sent on Monday, and released him.

231. Mr. Griswold was charged by criminal complaint and, on July 9, 2021, indicted in United States v. Griswold, No. 1:21-cr-00459-CRC (D.D.C.), on six counts: obstruction of an official proceeding and five misdemeanors, namely entering and remaining in a restricted building or grounds; disorderly and disruptive conduct in a restricted building or grounds; entering and remaining in the gallery of Congress; disorderly conduct in a Capitol building; and parading, demonstrating, or picketing in a Capitol building. His request to have the case heard in Florida was refused, and he was required to travel to Washington for court, far from his family.

232. In plea negotiations, Mr. Griswold's lawyer offered that he would plead guilty to every misdemeanor if the government dropped the felony, pointing out that Mr. Griswold had never been a felon, had broken nothing, damaged nothing, and hurt no one. Mr. Griswold recalls hearing the prosecutor say on that call that her bosses would not accept anything but a felony and that he "has to be a felon at the end of this."

233. On March 30, 2022, Mr. Griswold pleaded guilty before Judge Christopher R. Cooper to a single felony count of civil disorder. He did not believe he had done anything wrong, and no police officer had ever given him an instruction that he failed to follow.

234. On July 13, 2022, the court sentenced Mr. Griswold to seventy-five days of incarceration, two years of supervised release, $2,000 in restitution to the Architect of the Capitol, and a $100 special assessment. At sentencing the government argued that because he had brought a flagpole to the Ellipse he must have considered it a weapon, even though he had taken it back to his hotel before going to the Capitol for exactly the opposite reason. A group of about thirty students from a summer program was brought into the courtroom to watch the proceedings. Under



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

the surrender date the court set, he spent Halloween, Thanksgiving and Christmas in custody; he was released two days after Christmas.

235. Although there were two or three federal facilities in Florida where he could have served his sentence, the Bureau of Prisons sent Mr. Griswold to the federal prison in Oakdale, Louisiana, hundreds of miles from home. His family was never able to visit him. He was held in solitary confinement for his first thirty days there. While he was in custody, someone slipped a note under his door demanding that he stab the man he was housed with or face consequences when he got out. Mr. Griswold flushed the note and did nothing, knowing that an assault would have added years to his time.

236. The government made Mr. Griswold a felon, and he had to abandon the construction business he and his wife had just set up, losing the money they had put into it. The local news featured him repeatedly, at least once every two or three months for about three years. Many people in his community saw the coverage, and one person he had not seen since middle school reported him to the authorities after seeing him on the news.

237. The FBI kept Mr. Griswold's jacket for about two and a half years before returning it. It returned his other property except for one of his two phones, which it has kept.

238. Mr. Griswold's prosecution terminated in his favor with the pardon of January 20, 2025. His DNA remains in the government's possession.

**Daniel Jay Herendeen**

239. The Plaintiff Daniel Jay Herendeen lives in Spring Hill, Tennessee. He is a member of Millwright Union Local 1553. On January 6, 2021, he lived in Michigan, where his children lived and went to school. He belonged to a union in Michigan and also ran an epoxy business, which he advertised through Facebook.

240. Mr. Herendeen drove from Michigan to Washington with his friend Robert "Bobby" Schornak. There they met two friends from Tennessee, both of them sheriffs. The four men listened to President Trump's speech and, a few minutes before it ended, began walking peacefully toward the Capitol, talking along the way with other people who had come from Michigan. The two sheriffs fell behind because one of them was having trouble with his leg, and Mr. Herendeen and Bobby went on without them.

241. Near the Capitol steps Mr. Herendeen heard bangs and saw what he described as balls being shot through the crowd. Nothing struck him. He and Bobby became separated, and Mr. Herendeen went up the steps looking for him. The area in front of the Capitol doors looked "more like a tourist area than anything else." The doors were wide open, and he walked in past police officers. No one stopped him and no one asked him to leave.

242. Inside, Mr. Herendeen looked for Bobby. Along the way he helped people, stopped others from damaging property, and helped a person who had been tear-gassed. When he came upon about five police officers trying to catch their breath, he stood in front of them so they would not be pressed by the crowd. When he reached the stairs inside the building, he turned around, went back out the way he had come in, and left on his own. He was not injured.

243. In the months after January 6, Mr. Herendeen's internet use, phone, home and daily routine were watched. People stood in front of his house taking photographs, and he caught one of them doing it. The private FBI-funded group that calls itself Sedition Hunters published a page about him.

244. On March 18, 2021, Mr. Herendeen's children were running late for the bus, so he drove them to school. On the way home he stopped at a gas station about two blocks from his house. A Chesterfield police car was waiting at the side of the road, and as soon as he passed it the

officer pulled behind him and turned on his lights. Mr. Herendeen drove the short distance home and parked. The officer ran up, opened his door without a word, pulled him out of the car, and handcuffed him, saying there was suspicion that the vehicle was stolen.

245. U.S. Marshals, FBI agents, local police and other law-enforcement personnel then converged on his home, and the Chesterfield police turned him over to the FBI and the Marshals. Agents took his phone, put him in a car, and went through his house, flipping couches and chairs and going through all of his belongings. Authorities also seized a gun and the clothing he had worn on January 6.

246. Mr. Herendeen was taken to the Chesterfield police station and asked whether he would answer questions. He called his lawyer, who told him not to, and he declined. He was then taken to the federal building in downtown Detroit, where Bobby was being taken out of another car at the same time. Both men were booked. Mr. Herendeen was fingerprinted, held in a cell, brought before a judge by video, and released on a personal bond. Under the terms of his release he could not leave the state. Because his work required travel, he was allowed to leave only after reporting each time where he was going, his license plate, the address where he would stay, and how long he would be gone.

247. Mr. Herendeen was charged by criminal complaint in No. 1:21-mj-00312-RMM (D.D.C.), and on April 2, 2021, he and Bobby were indicted in United States v. Schornak, et al., No. 1:21-cr-00278-BAH (D.D.C.). He was charged with obstruction of an official proceeding and the four standard misdemeanors.

248. Mr. Herendeen reports that the government's first plea offer called for twenty years in prison and its second called for five years. Through his attorney he was told that if he went to trial a jury would not be in his favor and that he faced twenty years in prison. On December 17,

2021, Mr. Herendeen pleaded guilty to a single count, Count Two, entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1), a Class A misdemeanor. He was also told that sitting for an FBI interview and answering questions would help him at sentencing, and in hope of a lighter sentence he did so.

249. The government asked the court to sentence Mr. Herendeen to twenty-eight days of incarceration and three years of probation. His counsel asked for eighteen months of probation without incarceration, in line with the Probation Office's recommendation of a probationary sentence. On April 1, 2022, Judge Howell sentenced Mr. Herendeen to thirty-six months of probation, including fourteen days of intermittent incarceration and two months of home detention, and ordered him to pay $500 in restitution and a $25 special assessment.

250. By the time he had to serve his jail time, Mr. Herendeen was living in Tennessee, and his sentence was to be served in Michigan, so he had to travel there at his own expense. On one trip he arrived to surrender on the Friday before a holiday weekend, and the jail refused to accept him because the federal authorities had not sent it the paperwork. He had taken only a limited amount of time off work, so he returned to Tennessee and had to make another trip several months later to serve the rest of his sentence. He made three trips instead of two, and each cost him a few thousand dollars.

251. When a deputy at the jail learned that Mr. Herendeen was a January 6 defendant, he moved him out of his unit and into a higher-security felony holding unit with inmates on their way to prison. The jail was filthy. The ventilation was poor and the vents were covered in dust, the showers often did not work, the toilets had no privacy, the bunks were filthy underneath the mattresses, and he could not tell whether the clothing he was issued had been washed.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

252. While Mr. Herendeen was on probation, the government brought a probation-violation proceeding against him and threatened to jail him for the rest of his probation. He later crashed his vehicle into a bridge pillar. He attributes the crash to the strain of the threatened incarceration and the preceding events and reports that the crash shattered his hip, seven ribs and his face and caused a collapsed lung. He spent more than a year in rehabilitation and lost the vehicle. The government continued to press the violation, but his injuries kept him from traveling to Washington, and the hearing was postponed again and again. The matter was still pending when he was pardoned.

253. The prosecution cost Mr. Herendeen his home, his business and his daily life with his children. His homeowners association voted him out of his condominium because of his January 6 charges. At the same time he was arrested, Facebook deleted the account through which he advertised his epoxy business, and he lost that business. Forced to relocate, he moved to Tennessee and joined the union there at a pay cut, while his children remained in Michigan. His children were harassed at school over their father's charges and had to be taken out of school and homeschooled. After the crash he was unable to work for about a year and a half.

254. Mr. Herendeen lost friends and family over his case. For years he lived under the weight of the government's threat of twenty years in prison for walking into a building that no one stopped him from entering, and then under the fear that any misstep on probation would send him to jail.

255. Mr. Herendeen's prosecution terminated in his favor with the pardon of January 20, 2025, which ended the probation-violation proceeding still pending against him. In the arrest and search the government ransacked his home and seized his phone, his gun and his clothing, and it kept that property for almost four years before returning it.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

**Christopher Michael Kelly**

256. The Plaintiff Christopher Michael Kelly lives in Naples, Florida, with his wife and their daughter. On January 6, 2021, the family lived in New City, New York. Mr. Kelly was born and raised in New York in a family of law enforcement; his father was a police detective in the Bronx for thirty years, and his brother is a retired New York City police officer. For almost twenty years Mr. Kelly worked as an occupational therapist with disabled children just outside the Bronx. He also ran a photography business and worked for many years in the film industry as a prosthetic makeup artist.

257. Mr. Kelly drove to Washington for January 6 with his brother and two of his brother's friends. They stayed in Maryland, outside the city, and took the subway in. The Ellipse was already full, so they stood near the Washington Monument and listened to the speeches. They then walked down the Mall toward the Capitol, stopping for lunch on the way, and stood across the street from the Capitol grounds. Mr. Kelly, a photographer, recorded hours of video that day.

258. When thousands of people began moving toward the Capitol, Mr. Kelly walked onto the lawn behind them. He was there about five minutes. Mr. Kelly recalls that the wind chill was below freezing, and as a joke among friends he took off his shirt so that his brother could take a picture of him. When he heard what sounded like a grenade go off behind him, he told his brother it was time to go, and they walked back across the street, away from the noise. They waited by a tree until the rest of their group found them, returned to their hotel, and left Washington the next day. He did not touch or confront any officer.

259. On January 20, 2021, about two hours after the inauguration, five or six FBI agents came to Mr. Kelly's front door and told him they had a warrant for his arrest. They did not have



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

the warrant with them, and only one of them had identification. Mr. Kelly, who had nothing to hide, invited them in, while other agents surrounded the house. His nine-year-old daughter was home and was badly frightened. The agents asked whether they could record the conversation, and he agreed; when he asked whether he could record it as well, they told him no.

260. About forty minutes into the interview, two of the agents stepped outside to talk privately. Mr. Kelly later obtained, through his defense lawyer, the agents' own recording of that conversation. According to Mr. Kelly's account of the recording, one agent says that they cannot arrest him because he is innocent; the other asks whether "that thing" is still recording and turns the recorder off. The agents then arrested him anyway.

261. Mr. Kelly asked the agents to handcuff him out of his daughter's sight. They handcuffed him in the driveway beneath her window and drove him to Stewart Air National Guard Base for processing. The agents seized all of his computers and the equipment from his photography business, including the external hard drives holding his videos of January 6. They swabbed him for DNA twice, telling him the first sample had been botched.

262. Agents then drove Mr. Kelly about an hour to a county jail, questioning him along the way about whether he believed in aliens and whether he believed the earth was flat. He spent the night in a cell on a wooden slab. The next morning, on the drive to the federal courthouse in White Plains, the two agents exchanged a look, and one of them asked Mr. Kelly to work with them. He said only that he would have to ask his wife. He never agreed to work for the government.

263. Mr. Kelly was released on his own recognizance with no bond. As conditions of release he had to surrender his firearms and could not leave the state without checking in.

264. Mr. Kelly was charged by criminal complaint in United States v. Christopher M. Kelly, No. 1:21-mj-00128-ZMF (D.D.C.), before Magistrate Judge Zia M. Faruqui, with

obstruction of an official proceeding and aiding and abetting, 18 U.S.C. §§ 1512(c)(2) and 2; entering and remaining in, and disorderly and disruptive conduct in, a restricted building or grounds, 18 U.S.C. § 1752(a)(1) and (2); and violent entry and disorderly conduct, 40 U.S.C. § 5104(e)(2)(D) and (G). He was never indicted. The obstruction charge alone carried up to twenty years in prison. He hired a private lawyer at his own expense.

265. Mr. Kelly later sat for a "queen for a day" proffer by video, in which a federal prosecutor questioned him at length about exactly what he had done and when. The FBI agent who had written the arrest affidavit joined the call without announcement and tried to catch him in an inconsistency. Mr. Kelly told them what had happened, and offered to show the prosecutor his own video of Capitol Police letting people through the barricades.

266. The government obtained a search warrant for Mr. Kelly's Facebook account and relied on a confidential source. The FBI interviewed his neighbors. The New York Post published the photograph his brother had taken of him on the lawn, and on the day of his arrest he received calls about it from as far away as California, Texas and Rhode Island. The press portrayed him as a racist and a terrorist. He was placed on an online "kill list." He was repeatedly confused, by the public and by prosecutors, with a different January 6 defendant with a similar name. For a long time afterward his boarding passes were marked SSSS.

267. Mr. Kelly could not leave his house without being recognized. His wife and daughter had to move out of the family home. He lost his job and his business.

268. On June 1, 2021, more than four months after his arrest, the government moved to dismiss all charges against Mr. Kelly, stating that "upon reflection of the facts currently known to the government," dismissal "serves the interests of justice." The same day, Magistrate Judge Zia



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

M. Faruqui dismissed the case without prejudice on the government's motion, leaving Mr. Kelly exposed to being charged again.

269. After the dismissal, no lawyer would take Mr. Kelly's civil case. Unable to find work as an occupational therapist, he moved alone to Rhode Island for about nine months to sell windows, leaving his wife and daughter behind. The family sold their house in New York and moved to Naples. When Mr. Kelly applied for a job with the local water department, he was called back for a second screening and confronted with a thick file on his arrest that the department had obtained through a Freedom of Information Act request. He was hired only after explaining what had happened. He still fears that his co-workers will learn who he is.

270. Mr. Kelly's daughter was traumatized by the arrest. She was diagnosed with anorexia nervosa and was hospitalized for more than a week in the Tampa Bay area while Mr. Kelly stayed at a Ronald McDonald House and drove back and forth while trying to start a new job. She has been in therapy for years. During her outpatient treatment Mr. Kelly's wife and daughter lived in motels on the other side of the state, and he traveled to see them every weekend. The medical bills are still arriving and brought the family close to financial ruin. The prosecution brought his marriage close to divorce. It came on top of the deaths of both of his parents, nine days apart, and of his brother-in-law not long before. Mr. Kelly can no longer bear to watch the news.

271. Mr. Kelly's prosecution terminated in his favor on June 1, 2021, when every charge against him was dismissed on the government's motion. During his arrest, the government seized his computers and photography equipment, including the hard drives holding his video of January 6, and it took his DNA twice.

**Richard Mead Markey**

272. The Plaintiff Richard Mead Markey lives in Wolcott, Connecticut, with his wife and their two children. Before this case he worked for a plumbing and heating company, and he took vacation days to make the trip to Washington. On January 5, 2021, he drove to Washington with his father and Michael Tyler Roberts, and Ronald Macgabe met them there. The group went to Freedom Plaza and then returned to their hotel.

273. On the morning of January 6, 2021, Mr. Markey went to the Ellipse with the group, carrying sandwiches and snacks he had brought for everyone, and listened to the President's speech. Afterward the group walked toward the Capitol. On the way he noticed people in the crowd wearing earpieces and communicating with one another. Mr. Markey also recalls seeing people he believed were National Guard personnel come out of a building he identified as an FBI building and then go back inside.

274. Mr. Markey went back to the hotel to change clothing. While he was changing he turned on the television and saw that Ashli Babbitt had been shot. His father was still near the Capitol, and Mr. Markey insisted on going back to find him. When Mr. Markey located his father, his father told him that the police had started attacking people and were "killing people."

275. Mr. Markey went up to the area near the tunnel, where the crowd was packed so tightly that people could not move, breathe, or get out escape. He saw a police officer striking people with a baton, hitting whoever was in the officer's path.

276. At the front of the crowd Mr. Markey found himself beside Victoria White, with the crowd pushing both of them forward from behind. An officer told him that she was going to die. Mr. Markey called back to the officers, "Take her with you," hoping they would pull her inside and get her medical care. They did not. He put his arm up and used his own body to hold back the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

crowd and give her room so she would not be crushed. An officer then sprayed them with a chemical agent. Blinded, Mr. Markey reached back for someone to pull him out, and as he was pulled from the crowd he grabbed for the back of Ms. White's hood to bring her with him. His hand came away covered in her blood.

277. Once he was out of the crowd, Mr. Markey sat down and wept, believing Ms. White was going to die. He then walked back to the hotel with his group. For about three months afterward he had nightmares, until he learned that Ms. White had survived.

278. When Mr. Markey came home, he could not talk to anyone about what he had seen. Sedition Hunters published a page about him, and CNN broadcast his image repeatedly as part of its coverage portraying January 6 protesters as terrorists and insurrectionists.

279. About a year and a half after January 6, Mr. Markey's wife received a telephone call from a reporter at *USA Today* asking whether her husband was Richard Markey. She hung up. Shortly afterward the FBI called her. She told the agents he was not home and called him at once. Mr. Markey immediately called John Gulash, a criminal defense lawyer recommended by his brother-in-law, who told him not to speak with the FBI and that he would handle it. Mr. Gulash later referred him to Robert M. Frost, to whom Mr. Markey paid another $2,000 on top of the retainer he had already paid Mr. Gulash.

280. Before his arrest, a friend on the local police force warned Mr. Markey that the FBI had installed a camera on the utility pole just outside his front yard. Packages delivered to his home arrived opened, some bearing U.S. Customs and Border Protection stickers. His telephone calls, and especially his calls with his father, cut out again and again, sometimes every five minutes. He understood that his home was being watched and his calls monitored.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

281. At about 6:00 a.m. on July 17, 2023, Mr. Markey awoke to a text from a neighbor saying the FBI was outside. Between fifty and seventy FBI agents came to his home, along with the local fire marshal. Agents drove a BearCat armored vehicle onto his property, surrounded the house, flew drones over it, and ordered him over a loudspeaker to "come out with your hands up." Mr. Markey walked out in the shorts he had slept in, with no shirt or shoes, and saw red laser sights trained on his chest. Agents directed him step by step to the vehicle, handcuffed him, and put him in a car.

282. From the car Mr. Markey watched his wife come out of the house, terrified, with her arms raised. Then he watched his children, who were about eight and eleven years old, ordered out with their hands up while agents kept their guns drawn on the house even though he was already in custody. His mother-in-law had to come and take the children, who were frightened by the way the agents had treated their father; agents antagonized the family over their American-flag hats and clothing. Agents searched the house and demanded the keys to the camper parked behind it, and Mr. Markey gave them. Because he had cooperated, the agents allowed him to hug his children goodbye.

283. Agents took Mr. Markey to the FBI office in New Haven, Connecticut. He told them he would not talk without his lawyer. He was fingerprinted, photographed, and swabbed for DNA, and was then taken to the federal courthouse in Hartford, where he made his first court appearance and was released on a $100,000 bond. Over about thirteen months of pretrial supervision his proceedings were conducted remotely, he reported to a probation officer, and he was drug-tested twice.

284. Mr. Markey had booked and paid for a family vacation to Disney World before his arrest, and the court gave him permission to take it. He did not know he had been placed on the

government's Quiet Skies list and marked SSSS. At the airport TSA pulled him, his wife, and both children into a room and searched them. U.S. Marshals then escorted the family through the airport to the gate, where they told him they had to search him again before he could board. Mr. Markey insisted that they do it in front of the waiting passengers, so that others could see how the government was treating his family.

285. Mr. Markey was charged by a criminal complaint, sworn before Magistrate Judge Zia M. Faruqui on July 12, 2023, with eight false offenses: assaulting, resisting, or impeding certain officers with a deadly or dangerous weapon, 18 U.S.C. § 111(a)(1) and (b); civil disorder, 18 U.S.C. § 231(a)(3); entering and remaining in, disorderly and disruptive conduct in, and engaging in physical violence in a restricted building or grounds, 18 U.S.C. § 1752(a)(1), (a)(2) and (a)(4); and disorderly conduct in, obstructing or impeding passage through, and violent conduct in a Capitol building, 40 U.S.C. § 5104(e)(2)(D), (E) and (F). His case, United States v. Richard Markey, No. 1:23-cr-00417-APM (D.D.C.), was assigned to Judge Amit P. Mehta.

286. In the summer of 2024 the government offered Mr. Markey a plea agreement. He was told that if he rejected it he faced substantially more prison time and additional false charges, and he had watched what happened to other January 6 defendants who refused to plead and went to trial. His defense counsel, Jerry Ray Smith, gave him two hours to decide. In July 2024 Mr. Markey's father suffered a heart attack. His father believed that he was to blame for his son's legal troubles, because he had gone to Washington to keep him out of trouble.

287. On August 19, 2024, his parents flew with him to Washington, and, out of fear, Mr. Markey pleaded guilty before Judge Mehta to a single count of assaulting, resisting, or impeding certain officers with a deadly or dangerous weapon, 18 U.S.C. § 111(a)(1) and (b). He was taken into federal custody that day and placed in the D.C. jail. The jail's Correctional Treatment Facility,



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

where he had been told he would go, had reportedly closed about two weeks earlier, and he was placed in a maximum-security unit.

288. On his first day another inmate looked at Mr. Markey and told him he did not belong there and should ask his case manager to move him. He did. The case manager called the jail's response team, which rushed in, and instead of moving him to another housing unit, the jail put him in solitary confinement for about two weeks. The light in his cell did not work, and as a result he was let out of the cell for only about six hours in all during that period. He was not allowed to make telephone calls. His parents, who could not reach him, grew so worried that his attorney made what the family called a proof-of-life visit to confirm that he was alive and find out where he was being held.

289. From that cell Mr. Markey watched an inmate in a neighboring cell fashion a shank from metal shavings taken from his cell door; he recorded it in a journal he kept every day, and he feared for his life if he reported it. Days later, in a cell shared by two inmates two doors away, one inmate killed his cellmate. When the cell was cleaned, officers found Bibles covered in blood. The one Bible without blood on it was the Bible they gave Mr. Markey.

290. Mr. Markey was later moved to North 2, which he understood to be the jail's transgender housing unit. Cockroaches came into his cell from around the toilet, and he had to seal the opening himself.

291. The government asked for fifty-four months in prison; his counsel asked for twenty. On December 6, 2024, Judge Mehta sentenced Mr. Markey to thirty months in federal prison and thirty-six months of supervised release and ordered him to pay $2,000 in restitution, and the remaining charges were dismissed. Michael Tyler Roberts, who had traveled to Washington with



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

him and who, upon information and belief, cooperated with the FBI, was sentenced by the same judge the same day to fifteen months.

292. Mr. Markey was moved among several facilities during his incarceration and was shackled wrist to ankle for transport. At the jail in Grayson, Kentucky, the facility was so overcrowded that he slept on the floor for a month, and his repeated requests for religious services were never answered. There, when an inmate suffered a seizure and was striking his head again and again on the concrete floor, Mr. Markey, who has experience with seizures, cared for him until officers arrived much later; without that help the man would likely have died. He saw another inmate being eaten by ants. At the jail in Pike County, black mold was visible on the food trays and material dripped from the ceilings. He was later transferred to Philadelphia, where he was housed with Terry Allen, another January 6 defendant, who has since died.

293. On January 20, 2025, while he was still serving his sentence, Mr. Markey was pardoned.

294. Mr. Markey lost his income while he was incarcerated and paid for lawyers to defend him. He has been diagnosed with post-traumatic stress disorder. His wife and children watched him taken from their home at gunpoint. He has since obtained his contractor's license and started his own plumbing and HVAC business, and he is working to rebuild his customer base.

295. Mr. Markey's prosecution terminated in his favor with the pardon of January 20, 2025. In the raid and search the government broke two of his televisions, a Vizio and a Samsung, and seized two cell phones, which were broken; it seized his Faraday case and returned only items it deemed defective; and it has never returned the passport he surrendered. His DNA remains in the government's possession.

**Felipe Antonio Martinez**

296. The Plaintiff Felipe Antonio Martinez lives in Lake Elsinore, California, the town where he grew up. He has been a union pipefitter for almost twenty-five years, a trade that takes him to job sites around the country. At the time of these events he was married, the father of two daughters and a son, and the only income earner in the household. The family rented their home.

297. Mr. Martinez traveled to Washington for January 6, 2021, with three companions from Southern California. They went because of the violence that had followed political gatherings through 2020, including fights and stabbings at the December 2020 rallies in Washington, and they meant to look out for the families, grandparents and children they expected to come. Mr. Martinez carried about thirty pounds of medical gear in case anyone was hurt. During the rally the group stood near the Washington Monument.

298. When the rally ended, the men were cold and tired and planned to go back to their hotel. On the way, they received a telephone call reporting that families were being attacked at Freedom Plaza. They went there and found no one. The crowd was moving toward the Capitol, and they followed it. They heard what they first took to be fireworks and later learned were concussion grenades. None of their phones could call, text or load anything.

299. Near the Capitol the group was hit by concussion grenades and split up. One member of the group went off with other men and, the others were told, went inside the building. Mr. Martinez and another companion went up to the northwest side of the Capitol to find him and stood there for about two hours. Mr. Martinez did not enter the Capitol. He damaged nothing and never struck an officer. When a group of men near him wanted to throw a bottle at the officers, Mr. Martinez and his companions confronted them and stopped it.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

300. When the Capitol Police pushed the crowd back, word came that the President had told people to stand down, and Mr. Martinez and his companions stood down and left. On the ramp below the northwest side they set up a triage area, and for about forty-five minutes Mr. Martinez used his medical gear to treat people who had been burned and gassed, walking them through it as they rubbed at their eyes. Mr. Martinez reports that one of the men they tended had been struck in the head by a concussion grenade and that he was later told in prison that the man had died. Afterward, three women asked the group to walk them back to their hotel. Others joined along the way, and Mr. Martinez and his companions escorted nearly thirty people safely to the Marriott.

301. The Sedition Tracker posted photographs of Mr. Martinez and labeled him "3P Cali guy." His name later appeared in news coverage and in a Wikipedia entry naming the four men. The government also obtained the location data from the phone he carried that day.

302. At about 6:00 a.m. on February 19, 2021, Mr. Martinez, his wife and their three children were awakened by concussion grenades detonating outside their home. By the time he reached the front door, about eight had gone off, including at the side of the house. Through the windows he could see the silhouettes of armed tactical officers. They called him by name and ordered him to open the door or they would kick it in. He asked to secure his dog first. They refused and began to tear the steel security door off its frame. When he opened the door, the dog bolted past the officers and ran off while Mr. Martinez shouted at them not to shoot it.

303. Agents handcuffed Mr. Martinez and his wife at once. When his thirteen-year-old daughter reached for the dog, an agent grabbed her by the wrist and handcuffed her too. Mr. Martinez was taken outside in his pajamas, without socks, in the cold, and then his children were brought out, wide-eyed and frightened, wrapped in space blankets. Agents separated him from his family and questioned him in a back room of the house for about four hours.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

304. The raid broke the front security door and the side sliding door. Agents told Mr. Martinez the government would pay for the damage. It never did, and he paid to replace the glass and the screen door himself. The agents seized his phone, a broken computer, a broken phone, the clothing he had worn on January 6, and a notebook. Because of the raid, the family's landlord evicted them. With nowhere to go, they moved in with relatives and had to pay for moving and storage, lost their deposit, and struggled to put together a down payment on a new home.

305. Mr. Martinez went back to work on the road. He was working the swing shift on a job in Austin, Texas, when the officer who had questioned him telephoned to say that charges had been filed and that he had half an hour to report in Riverside. Mr. Martinez told him he was in Texas. On June 10, 2021, the day after a grand jury indicted him, he reported instead to the United States Marshals in Austin, where he was arrested, stripped, put in jail clothing, shackled, and brought before a judge.

306. Mr. Martinez was released on his personal recognizance and remained on pretrial supervision for nearly three years, from his arrest until he was taken into custody at his sentencing on April 19, 2024. Although he had been sober for seventeen years, he was made to take a drug test every day; he was the only one of the four men required to do so. His work requires him to travel, and under the terms of his release he had to remain at each job location for six months, so that a short job could leave him stranded far from home. That is what happened on a job in Portland.

307. Mr. Martinez was indicted on June 9, 2021, in United States v. Hostetter, et al., No. 1:21-cr-00392-RCL (D.D.C.), before Judge Royce C. Lamberth, with conspiracy to obstruct an official proceeding, obstruction of an official proceeding and aiding and abetting, entering and remaining in a restricted building or grounds, and disorderly and disruptive conduct in a restricted building or grounds. On June 14, 2021, he pleaded not guilty to every count. The government



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

offered him a plea. He would not plead guilty to something he had not done, though his lawyer warned him that the prosecutors would hit him hard if he refused. He went to trial.

308. Mr. Martinez was tried before a jury together with three co-defendants, each represented by separate counsel. The trial was expected to last two weeks and ran seventeen trial days. The government built its case on photographs of the men and a story assembled around them. His lawyer showed that the joint session of Congress had already recessed before the men arrived at the Capitol. On November 7, 2023, the jury convicted Mr. Martinez on all four counts.

309. On April 19, 2024, Judge Lamberth sentenced Mr. Martinez to twenty-one months in prison, thirty-six months of supervised release, $2,000 in restitution, and a $250 special assessment; the government had asked for six and a half years. He was taken into custody at sentencing. He expected to be sent to a minimum-security camp. Instead, the Bureau of Prisons moved him through seven facilities in four months and put him on Con Air four times in a single month, shackled for every transfer. He ended up at the federal prison in Yazoo City, Mississippi, about 1,500 miles from his nearest family member, where a corrections officer told him he was a "special case" and that was why he had been placed at a higher security level. The facilities were filthy and infested with insects; a cockroach crawled over his head, and one housing area was overrun with lice.

310. Mr. Martinez was pardoned on January 20, 2025.

311. At his September 16, 2026 interview, Mr. Martinez estimated that the case had left him close to $100,000 in debt for lawyers, rental cars, hotels, and repeated travel to and from Washington. He expected to devote his earnings over approximately the following year to paying those obligations. His marriage did not survive, and he is now going through a divorce. Only in the last few months has he been able to reestablish contact with his children. They remain afraid



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

of the police and of anyone wearing a badge, and his daughters still jump at fireworks or any loud bang because they were awakened by concussion grenades. When he reaches for his children, they sometimes pull away.

312. News coverage of his case left relatives ashamed of him. Except for his mother, one brother, a niece and nephew, and a few friends, his aunts, uncles and friends have cut him off, and no one else reached out to him while he was in prison or after he came home. Mr. Martinez is withdrawn and quick to shut himself off from people, and he describes himself as a different man from the one who went into prison.

313. Mr. Martinez's prosecution terminated in his favor with the pardon of January 20, 2025. The government has never reimbursed him for the doors its agents destroyed in the raid, as it promised to do.

**Anthony Michael Puma**

314. The Plaintiff Anthony Michael Puma lives in Brownstown, Michigan, with his wife. They have three sons. For fourteen years before this case he owned and ran his own property-maintenance company, doing snow removal, lawn care, landscaping, tree removal, lawn irrigation, and minor electrical and plumbing work for his customers. In most years the business brought in between $50,000 and $75,000, and in its best years more than $100,000. He now works as an instrumentation technologist in the prototype automotive industry.

315. Mr. Puma traveled to Washington on January 5, 2021, and stayed the night in a hotel with friends. On January 6, 2021, he skipped the President's speech and slept in. He and his friends set out for the Capitol at about 2:00 p.m., walking and chanting, and Mr. Puma recorded the day on a GoPro camera. When he reached the Capitol grounds he saw no barriers of any kind. He followed the crowd and made his way onto the mezzanine.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

316. At about 3:08 p.m. Mr. Puma walked into the Capitol through a window that had already been broken. He walked through two rooms and down a hallway to the Rotunda, where he chanted "USA" and looked at the art. When officers told him "this way," he followed their directions and walked out the door. He was inside the building for about eight and a half minutes. He did not strike anyone or damage anything. When he saw a man holding a fire extinguisher, Mr. Puma told him to throw it to the ground because "we don't bust windows."

317. Back on the mezzanine, officers in riot gear directed Mr. Puma toward the grandstands, and he sat on the mezzanine for half an hour or more. When police then formed a line and began pushing the crowd, an officer shoved Mr. Puma off the wall at the edge of the mezzanine. He fell what he estimates was ten to fifteen feet and sprained his ankle, with symptoms lasting approximately two weeks. He stayed on the grounds until nightfall and then walked back down Pennsylvania Avenue to his hotel.

318. The government built its case against Mr. Puma from his own phone and social-media material, including his Facebook Live videos, and from his GoPro footage. FBI agents first interviewed him on January 17, 2021, and took an SD card holding his GoPro videos of January 6.

319. On May 27, 2021, nearly five months after January 6, Mr. Puma was asleep at home at about 9:00 a.m., after his wife had left for work and his sons for school, when FBI Agent Harris telephoned him. The agent told him he was on the front porch, ordered him not to hang up, and told him to come unlock the door. Mr. Puma let him in, and about twenty federal agents and state officers followed into the house. They held Mr. Puma in his travel trailer and questioned him for about two hours. They seized his computers, phones, GoPro cameras, other electronics, and the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

clothing he had worn on January 6. They took him downtown, where he was brought before a judge and released on a $10,000 unsecured bond about three hours later.

320. Reporters were beating on the family's door the next day. Mr. Puma's name and photograph were published on the Department of Justice website and by NBC, MLive, and the Detroit Metro Times, and he was called a domestic terrorist in the news. His customers no longer wanted him on their property, and the business he had built over fourteen years collapsed.

321. Mr. Puma was placed on pretrial supervision and drug-tested again and again. Pretrial services would not recognize self-employment, so he was required to find a job. He got one and lost it because of the constant January 6 news coverage; coworkers said they could not work next to him. He found another, and on his first day someone recognized him; the employer called him on his drive home and fired him. For a long time he believed he was unemployable.

322. On July 7, 2021, Mr. Puma was indicted in United States v. Anthony Puma, No. 1:21-cr-00454-PLF (D.D.C.), before Judge Paul L. Friedman, on five counts: obstruction of an official proceeding and aiding and abetting, 18 U.S.C. §§ 1512(c)(2) and 2; entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building, 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G). Mr. Puma reported that prosecutors characterized his entry through an already-broken window as violent. He drove to Washington for his first appearance, only to be told to attend by Zoom from his hotel room, and every later proceeding before sentencing was held by Zoom.

323. Mr. Puma's court-appointed counsel filed motion after motion, and the court denied every one. The government then told him he could plead guilty that day to the felony obstruction



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

count or go to trial on all five counts, with exposure to decades in prison and fines he understood could reach $100,000. He is a blue-collar worker, did not believe he could afford a lawyer for trial, and did not know whether his appointed counsel would stay with him through one. He had watched January 6 juries return guilty verdicts in under half an hour. His lawyer told him the plea was his best option, and after talking it over with his family, on August 30, 2022, he pleaded guilty to obstruction of an official proceeding, 18 U.S.C. § 1512(c)(2), a provision whose scope the Supreme Court later narrowed in Fischer v. United States.

324. At his sentencing in March 2023, which the court required him to attend in person, the government played his own videos to portray him as violent, including the moment he told a man to put down a fire extinguisher and his walk through the already-broken window. Mr. Puma, his wife, his son, and his niece all spoke to the court, and he apologized in tears. The government asked for eighteen months. The court sentenced him to nine months in prison, twenty-four months of supervised release, a $500 fine, $2,000 in restitution, and a $100 special assessment.

325. Mr. Puma, who had never served time in prison, self-surrendered at FCI Milan in Michigan on May 10, 2023. He was put in solitary confinement in the Special Housing Unit for his first twenty-one days. He was shackled every time he was taken to shower, to a visit, or out for a cell search. He was not allowed phone calls, including legal calls, and was given no commissary, no pencil, and no paper. He had no quilt and no pillow. The lights were never turned off, there was no window, and he had no time outside, so he could not tell whether it was day or night. He slept one or two hours a night. He asked to attend religious services, or anything that would let him see another person, and was not allowed to go.

326. Mr. Puma asked for psychiatric care while in solitary. He saw a psychologist about once a week for five minutes. After four days he told her he was losing his mind; by the second



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

week he was in tears, telling her he was dying in there. He asked for medication and was refused. When he said he was sleeping only an hour a night, staff told him that was normal in prison. He was released into general population on May 31, 2023, and even then went another two weeks without a legal call. One guard told Mr. Puma that, if the guard had been there on January 6, the guard would have shot him in the face.

327. FCI Milan is a nearly century-old prison, and it was filthy. Mr. Puma had to tear up shirts and sheets to clean the floors. He had to pay other inmates in stamps, the prison's currency, to get a haircut and a shave.

328. After about sixty-three days at FCI Milan, Mr. Puma was sent on July 13, 2023, to a halfway house, where he spent about five months under weekly drug testing and was required to hold a job. He was discharged on December 4, 2023, to begin two years of supervised release.

329. Mr. Puma was pardoned on January 20, 2025. Before then, the Supreme Court had narrowed the obstruction statute under which he had been convicted.

330. The prosecution changed Mr. Puma. He became distant and angry with his family. At times while the case was pending he called his lawyer saying things that sounded suicidal, and his lawyer called his wife to ask her to check on him. The weeks in solitary left lasting psychological effects, and some of what happened to him in prison he still cannot bring himself to talk about. He lost a business he had spent fourteen years building and two jobs, and he still lives paycheck to paycheck.

331. Mr. Puma's prosecution terminated in his favor with the pardon of January 20, 2025. Upon information and belief, his fingerprints remain in the government's possession.

**Stephen Chase Randolph**

332. The Plaintiff Stephen Chase Randolph lives in Fredericksburg, Texas, with his wife. In January 2021 the couple lived in Harrodsburg, Kentucky, where Mr. Randolph managed a gas station and, when he was not at work, cared for her elderly grandmother. He had recently completed EMT-Basic training and was state certified. He had never been to Washington, D.C., and had never been to a protest of any kind.

333. Because no one else could be found to stay with the grandmother, the woman who is now Mr. Randolph's wife stayed behind, and he left alone at about 11 p.m. on January 5, 2021, and drove through the night, arriving in Washington at about 9 a.m. He wore warm clothes—thermals, pants, a jacket and boots—and carried the phone belonging to the woman who is now his wife. He walked near the Ellipse and the Washington Monument to hear the speeches, and later walked toward the Capitol alongside a stranger who was playing the President's speech on his phone so that he could keep listening.

334. Mr. Randolph arrived at the bicycle-rack barrier below the Capitol, where a hundred or more people were standing, and took a place at the far right end of the line. Only about five officers stood on the steps behind the racks. They wore ordinary cold-weather uniforms with nothing that readily identified them as police. The racks were linked together along their length, so that movement at one point was felt all along the line, and the right end was snagged by its foot on a concrete pillar.

335. As the crowd pressed forward, people along the line lifted the racks and carried the left end up to the staircase while the right end, where Mr. Randolph stood, stayed caught on the pillar. A masked man walked over and unhooked it. The tension in the line was released at once. The rack swung toward the stairs, knocking a female Capitol Police officer back against the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

handrail, and yanked Mr. Randolph forward with it. To keep from going face first into the stairs, he tried to hop over the rack, and he rolled his left ankle. As he fell to his left he grabbed the nearest officer to catch himself. That officer and another punched him about six times in the head and cursed him, splitting his lip. Mr. Randolph never threw a punch. He put his head down and held the officer at arm's length so the blows could not reach him, until people in the crowd pulled him away. Mr. Randolph recalls that the female officer was helped to her feet within moments and ran back up toward the Capitol.

336. Overwhelmed by what he had seen, Mr. Randolph became sick. He sat down on a small platform partway up the lawn, where a stranger gave him something to drink, and then vomited against one of the small trees on the lawn. He walked back toward the Mall, where a German reporter interviewed him for about half an hour and photographed his split lip. When he heard flash-bangs going off at the Capitol, he told people around him not to go up there.

337. When the flash-bangs stopped, Mr. Randolph walked back toward the Capitol. Just past a low wall near the building he came upon a man lying on the ground, apparently dead, with people giving him CPR. Someone said that the ambulance could not get in to reach him. Drawing on his EMT training, Mr. Randolph retrieved a section of bicycle rack and brought it back so it could be used as a makeshift stretcher, and the man was carried out to the ambulance on it. He then walked the grounds looking for anyone else who needed help.

338. Mr. Randolph later asked several officers in neon-green jackets whether they knew the female officer from the barricade, because he wanted to know whether she was all right. One of them told him she was fine. Near a set of bleachers, a man who had been sprayed with a chemical agent came out from underneath and asked Mr. Randolph for a multi-tool; Mr. Randolph realized that people were trying to take the bleachers apart while officers were standing on them. He called



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

one of those officers over and warned him that people were trying to collapse the bleachers under them, and the officer immediately passed the warning to the other officers. That exchange is on police body-camera footage, which was shown at Mr. Randolph's trial.

339. Mr. Randolph never entered the Capitol. He left the grounds by climbing down a heavy bundle of sound-equipment cables and began walking back to his car at about 5:30 p.m.

340. The FBI identified Mr. Randolph by facial-recognition technology, as the press later reported. He did not know he was being sought; he understood from the news that only people who had gone inside the Capitol were being arrested. For months he was watched. From the gas station where he worked, he saw a sheriff's car and two black SUVs parked in a shopping center three or four hundred yards across a four-lane highway and caught the glare of a camera lens; the government later produced surveillance photographs of him standing in front of the station. On April 13, 2021, two undercover FBI agents came into the gas station, engaged him in conversation about January 6, 2021, and secretly recorded it. On another occasion, a vehicle watching him parked in a neighbor's driveway behind a large tree; when the neighbor pulled in and leaned on his horn, the vehicle drove across the neighbor's yard to get away. At no point was Mr. Randolph told that he was wanted or given the chance to turn himself in.

341. On April 20, 2021, Mr. Randolph was asleep at the grandmother's house when he was awakened at about five or six in the morning by agents on a megaphone announcing that the house was surrounded. Close to ten agents were outside. He opened the door in the basketball shorts he slept in. Agents handcuffed everyone in the house and walked him out to a cruiser. They asked him for his guns; he had none. Because he had no phone of his own, he had carried to Washington the cell phone of the woman who is now his wife; the agents took that phone and copied its contents. The grandmother Mr. Randolph cared for had died the day before. When he



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

told the agents he had a funeral to attend, an agent told him they would get him out before it. They did not.

342. Mr. Randolph was held for about a month at the jail in Woodford County, Kentucky, where he was denied release as a flight risk although he had no bank account and no money. While he was there, the government offered him five years at a prison camp if he would plead guilty to assault with a deadly weapon resulting in serious bodily injury, the deadly weapon being the bicycle rack. He refused to admit to something he had not done. He was then moved to Northern Neck Regional Jail in Warsaw, Virginia, for about another month. Because he was charged with assaulting an officer with a deadly weapon, he was housed in a pod with violent offenders, including a man held on a triple homicide. He witnessed repeated fights and stabbings there, including one in which a man was stabbed many times before guards could get through the two doors into the pod. During his detention two of his fillings came out. He was given nothing but Orajel; with no scissors or knife to open the bottle, he had to chew it open and lost another filling doing so. He received no dental care.

343. Mr. Randolph was indicted on April 30, 2021, in United States v. Paul Russell Johnson and Stephen Chase Randolph, No. 1:21-cr-332 (D.D.C.), and pleaded not guilty to nine counts on May 7, 2021. On June 16, 2021, after about two months in pretrial detention, the court granted his motion for release, and he was placed on GPS electronic monitoring and other strict conditions, including drug testing, although nothing in the case involved drugs. He wore the ankle monitor for about three years.

344. When Mr. Johnson demanded a speedy trial, the government did not try them. Instead it combined them with Ryan Samsel, James Tate Grant and Jason Benjamin Blythe, men Mr. Randolph had never met or spoken to, and recharged him by superseding indictment in a new



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

case before Judge Jia M. Cobb, United States v. Samsel, et al., No. 1:21-cr-00537-JMC (D.D.C.), which restarted the clock. The only connection among the defendants was that they had been standing near one another on the same bicycle-rack line. The government at first suggested a conspiracy but never proved one. The case went through a third superseding indictment, and at one point Mr. Randolph faced fourteen counts. He was arraigned on the superseding indictment on January 27, 2022, and pleaded not guilty to ten counts, including assaulting officers with a dangerous weapon and obstruction of an official proceeding.

345. Mr. Randolph was represented by appointed counsel. He was allowed a single session of about two hours to review the government's body-camera footage, and in that time he found the clip of himself warning the officer about the bleachers. His counsel did not pursue his challenge to the government's use of facial-recognition technology. His counsel told him she could foresee a sentence of about two years.

346. Mr. Randolph's case was tried to the bench before Judge Cobb beginning in October 2023. Mr. Randolph and his wife paid for lodging in Washington for the trial. The female officer testified that she had lost consciousness. She also testified that since January 6 she had to wear special glasses to look at monitor screens or suffer severe headaches, but she watched the trial videos on a courtroom monitor without glasses, as a co-defendant's counsel pointed out. On February 2, 2024, the court acquitted Mr. Randolph of six of the ten counts, including obstruction of an official proceeding and the charges that he entered, engaged in disorderly conduct, and engaged in physical violence on restricted grounds with a dangerous weapon, and found him guilty of four.

347. On September 19, 2024, Judge Cobb sentenced Mr. Randolph to ninety-six months in federal prison, thirty-six months of supervised release, and $2,000 in restitution. He was not



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

allowed to self-surrender. He was taken into custody from the courtroom, and his wife, who had come to Washington expecting him to come home with her, had to drive home alone.

348. Mr. Randolph was held about a week at the D.C. Jail, where the air was thick with mold and dust and where guards shut off the water to the cell he shared with a co-defendant, leaving them without drinking water or a working toilet for about twelve hours. He was then held about a month in Philadelphia. There, during a search of his unit, a guard patting him down struck him hard in the groin, and the same guard walked the unit spraying chemical agent from a latex glove into the cells until no one could breathe. He was moved in handcuffs, waist chains and leg shackles by bus and by Marshals' aircraft to the Grady County jail in Oklahoma for one to two weeks, and then to the federal prison in Thomson, Illinois, where he was to serve his eight years. He was always held too far from home to receive visitors.

349. Mr. Randolph was pardoned on January 20, 2025, and was released from federal custody that month.

350. Mr. Randolph's Facebook and Instagram accounts were deleted, and he has been unable to recover them. He suffers from what he describes as post-traumatic stress: the sight of a charter bus or an airplane takes him back to riding in handcuffs and leg shackles, and he has withdrawn from other people. The prosecution took years of his life with his wife and family. He now works six days a week repairing and selling outdoor power equipment and doing tree work on the side.

351. Mr. Randolph's prosecution terminated in his favor with the pardon of January 20, 2025. In the arrest the government seized and copied the cell phone he had carried to Washington and took his clothing.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

**Kim Michael Sorgente**

352. The Plaintiff Kim Michael Sorgente lives in California. He has two children, a son and a daughter. Before this case he lived with his wife and children in the Bay Area, where his wife worked for the City of Pleasanton. Through 2020 he had attended meetings of his county Board of Supervisors to protest the COVID lockdowns. He is not employed and receives SSI.

353. On January 6, 2021, Mr. Sorgente marched to the Capitol carrying a megaphone and his phone. He arrived at the barricades just as explosions began and saw people with wounds on their faces. He recorded about an hour and eighteen minutes of what happened. When someone cut an opening in a tarp, the crowd funneled through it, and Mr. Sorgente moved with it to a bend where five or six officers faced about twenty-five people. The officers pepper-sprayed the people in front of them. Mr. Sorgente took a water bottle and rinsed the pepper spray out of their eyes. The officers eventually fell back, and the crowd moved on to the stairs at the tunnel.

354. In the crush of the crowd near the tunnel, Mr. Sorgente's phone was forced out of his pocket and fell. He spent a couple of hours there searching for it as the crowd surged forward and receded, in heavy pepper spray and tear gas. Officers were hitting people with sticks and jabbing them in the face with poles taken from the crowd, while people were packed so tightly that they could not raise their hands to protect their faces. Mr. Sorgente saw an officer driving a long wooden pole into the faces of people trapped in the crowd and asked him whether that was an authorized use of the weapon. The officer nodded.

355. A woman, Rosanne Boyland, had gone down in the crush of the crowd. Mr. Sorgente could hear her friend crying and calling for her. He was close to the police line, and for about two minutes he begged the officers to stop pushing and let her get up, telling them she was going to die. He screamed and cried and did everything he could to make them listen. Part of the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

officers' body-camera footage shows him saying, "save her, please save her." When he told one officer, "you're killing her," the officer answered, "no, you." The officers did not stop. Ms. Boyland died.

356. When Mr. Sorgente turned away, an officer struck him on the head from behind with a club. Blood ran down his face. He was concussed and dizzy, saw stars, and fell. He could barely stand for about twenty minutes. When he recovered, he found a young man who had been blinded by the gas, took hold of the back of his jacket, and guided him out of the area. Mr. Sorgente's clothing was soaked from rinsing his own and others' eyes, and he became so cold that someone gave him a flannel shirt to wear. He then left and flew home to California, depressed and traumatized by what he had seen. A photograph of the blood running down his forehead was later published online.

357. Sedition Hunters published Mr. Sorgente's image under the name "Bad Samaritan Grey," because he wore a gray hoodie and had tried to save Ms. Boyland's life. People online falsely claimed that he had fallen on her; he was never closer than five to eight feet from her. Southern California news outlets reported that he faced fifteen years in prison, and newspapers reported his head wound without reporting that he had been struck while pleading with police to save a dying woman.

358. Mr. Sorgente's wife was afraid of the government and of being associated with him, and she did not want him at the house. He left so that she and the children would not have to, moved to Southern California, and lived in his car and later in a sober living home, although he does not drink or use drugs, because it was the only place that would take him. He returned to the Bay Area once or twice a month to see his children. Upon information and belief, the FBI watched the family's home in the Bay Area during that time.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

359. On October 25, 2021, more than nine months after January 6, Mr. Sorgente walked out of the Central Justice Center in Santa Ana after a court hearing, dressed in a suit and carrying an umbrella in the rain. As he walked toward his car, a man called out his name. Mr. Sorgente did not recognize him and thought he was about to be attacked. About fourteen agents then converged on him on foot and from cars, took off his tie, belt and necklace, handcuffed him, searched his pockets, and took his phone and other property. They walked him to his car and searched it. They demanded the passcode to his phone and told him that if he did not give it, they would have to destroy the phone to get at its contents and he would not get it back. He never gave them the passcode.

360. Mr. Sorgente was held for about twenty-six hours in a federal detention facility in downtown Santa Ana. He was kept alone the entire time and was given no shower. Upon information and belief, he was fingerprinted. He was released the next day without bail, on an ankle monitor. The court permitted him to continue traveling between Southern and Northern California to see his children, as he had done throughout the months before his arrest. He was ordered to surrender his passport, and he drove from Pleasanton to the FBI office in San Francisco to turn it in.

361. On October 30, 2021, days after his release, five men surrounded Mr. Sorgente on a street in Orange, California, in broad daylight and for about two minutes shoved, elbowed and kicked him as he walked. Mr. Sorgente recognized one of them. Understanding that any fight would be called a violation of his release conditions, he did not fight back. When city police arrived, the men shouted “violation” and told the officers he was wearing an ankle monitor. The police detained Mr. Sorgente for about forty-five minutes and told him that asking a bystander to tell them what he had seen could be considered witness tampering. Only after he showed them the

welt on his leg did they treat him as the victim. An MRI later showed that the assault had fractured his T11 vertebra. A report about the incident that the federal government produced in his discovery asserted that Mr. Sorgente, newly released and wearing an ankle monitor, had walked up to five men and challenged them to fight.

362. Mr. Sorgente was charged by criminal complaint in United States v. Kim Michael Sorgente, No. 1:21-mj-00634-RMM (D.D.C.), with civil disorder in violation of 18 U.S.C. § 231(a)(3), entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1), and disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2). He was later indicted on the same charges, and he pleaded not guilty to every count. His federal public defenders told him the government was talking about adding more charges.

363. Mr. Sorgente asked for discovery on the federal agents, informants and assets in the crowd on January 6, because that information was relevant to his defense and could be exculpatory. His appointed lawyers would not ask for it, and he went through about six federal public defenders. He raised the request directly with the court at a closed hearing on his representation. The material was never provided. When he told his public defender that the men who attacked him in Orange had claimed to be acting because of another January 6 defendant, she did not respond.

364. On pretrial release, Mr. Sorgente's supervising officers treated him as a threat. One pretrial officer wrote a report describing him as breathing heavily, staring at her, clenching his fists and heaving his chest, as though he were holding back rage. None of that happened, and the report was rescinded after his defense told the office that video contradicted it. A pretrial officer refused to let him travel to see his children for Halloween in 2021, despite the court's order allowing that

travel, and he did not go rather than risk being taken back into custody. He told his pretrial officers repeatedly that their false accusations would frighten the people he was living with and make him homeless.

365. That is what happened. For about two years and nine months Mr. Sorgente slept in his Toyota Corolla in Newport Beach under a car cover, from midnight until 6 a.m., and charged his ankle monitor each morning at a friend's restaurant in Huntington Beach. At his September 21, 2026 interview, he reported that his homelessness had ended a little over a year earlier.

366. Mr. Sorgente never went to trial and was never convicted. In January 2025 the false federal charges against him were dismissed.

367. The government has never returned the property it took from Mr. Sorgente: his iPhone; a flash drive holding his design for a religious sticker bearing the face of Jesus and the word "pray"; his son's baseball bat, taken from the trunk of his car; his megaphone; and his passport. When he petitioned for the return of his phone, the government asked him to sign a document releasing it from liability as the price of getting it back. On the advice of counsel, he refused.

368. The prosecution cost Mr. Sorgente his marriage and his place in his children's lives. His wife, whose job with the City of Pleasanton was at will, feared losing it because of her association with him. Within weeks of his arrest she pressed legal separation papers on him, and he signed them, in shock and without his reading glasses, without reading them. He later came to believe that the papers had affected his parental rights. He has been legally separated since December 2021, and he did not try to seek custody while he faced federal charges. Friends and family cut him off, some angry that he had protested and others afraid that the government would target them for associating with him.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

369. Mr. Sorgente has documented post-traumatic stress disorder. He has cried many times over the death of Ms. Boyland and suffers survivor's guilt, believing he might have done more to save her. The years of the prosecution, the homelessness and the isolation have worn him down, and, at his September 21, 2026 interview, he reported that he was in a crisis stabilization unit.

370. Mr. Sorgente's prosecution terminated in his favor when the charges against him were dismissed in January 2025. The government has never returned his iPhone, flash drive, baseball bat, megaphone or passport.

**Andrew James Williams**

371. The Plaintiff Andrew James Williams lives in Clanton, Alabama, on a small farm with his wife, Becca, and their four children. In January 2021 he lived in Central Florida with his wife and their six-month-old daughter and worked as a firefighter and paramedic for the Sanford Fire Department in Sanford, Florida, where he had served since October 2016 on the busiest rescue unit in the county without ever being written up or disciplined. He is a type 1 diabetic and depends on insulin.

372. Mr. Williams flew to Washington for January 6, 2021, with his aunt, his mother's sister, a longtime teacher and school principal then about sixty years old. He took a single shift off from the fire department to go. They stood near the Washington Monument for the rally and stayed through the President's speech, then walked to the Capitol.

373. Mr. Williams went to the side of the Capitol where there were fewer people. Police fired tear gas, pepper spray and rubber bullets into the crowd there. He saw no one throw a punch and did not learn that there had been any violence that day until he returned to his hotel and turned



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

on the news. The officers on the steps above the crowd then turned around and walked away from their lines, and the crowd went up the stairs.

374. Mr. Williams and his aunt walked in through an open door behind the people already inside. He saw one broken window the entire time he was there. Inside, he and his aunt took bottles of water from a pallet that had been left in the hallway and sat on a bench to rest. Mr. Williams had a friendly conversation with an older Capitol Police officer, who was calm and cordial, and shook his hand.

375. His aunt, who had visited the Capitol many times on school field trips, knew where Speaker Pelosi's office was. Mr. Williams took a photograph of himself beneath the sign bearing her name, pointing up at it. He and his aunt then walked out the back of the building, where Capitol Police officers were letting people in two at a time. He and his aunt bought sandwiches before the curfew and walked back to their hotel.

376. Mr. Williams recorded much of the day on his phone and sent the videos to a group text of friends. One of them posted the videos to Snapchat. A man from Mr. Williams's community, with whom he had once argued about COVID masks, took the videos and sent them to the local news stations in Central Florida, and emailed Mr. Williams's wife's former employer to say that Mr. Williams was a terrorist. At about 5:30 that evening the vice president of his firefighters' union called him at the hotel to tell him he was all over the news.

377. When Mr. Williams got home, reporters were waiting at his townhouse, and he, his wife and their six-month-old daughter stayed at his mother's house for about ten days. The fire department placed him on paid leave. A city commissioner spoke against him to the media on January 6 or the next day.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

378. On January 12, 2021, the day after the government filed a criminal complaint against him, FBI agents contacted Mr. Williams's lawyer. Mr. Williams, who was with a technician copying the contents of his phone on his lawyer's advice, went straight to his lawyer's office in Orlando, and the two of them walked to the federal courthouse, where he turned himself in to the United States Marshals. Agents came to his townhouse with what his neighbors described as the bomb squad and told his lawyer they would break down the door unless someone brought a key; his sister-in-law drove over and let them in, and they searched the house. Agents also went to his mother's house looking for him.

379. Mr. Williams was held in a cell at the courthouse and was not allowed access to his insulin. While he was in custody, FBI agents took him out of the cell, interviewed him, and swabbed him for DNA. He was brought into the courtroom for his bond hearing shackled at the wrists and ankles, with his mother watching. He was released that day on a $25,000 signature bond. News cameras surrounded him as he left the courthouse, and that night a reporter ran at him with a microphone in his own driveway.

380. Once Mr. Williams was arrested, the fire department put him on leave without pay until his case was resolved, and the fire chief spoke against him to the media. Firefighters in the same department who had been charged with driving under the influence, with felony assault, and with possessing marijuana in uniform had never been placed on unpaid leave, let alone fired. To support his family, Mr. Williams went to work building doors in a mill shop owned by one of his lieutenants, earning $12 an hour.

381. Mr. Williams was charged in United States v. Andrew James Williams, No. 1:21-cr-45-DLF (D.D.C.), before Judge Dabney L. Friedrich, with two misdemeanors, entering and remaining in a restricted building or grounds and disorderly or disruptive conduct in a restricted



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

building or grounds, each carrying up to a year in jail. While on release he could not keep firearms in his home and had to drive about two hours to Ocala for drug testing. Florida's then Commissioner of Agriculture, Nikki Fried, suspended the concealed-weapons licenses of Floridians charged in connection with January 6, including Mr. Williams. He appealed and lost, and the license remains suspended today.

382. The government offered a plea to a single count of parading, demonstrating, or picketing in a Capitol building, which carried a maximum of six months. The night before Mr. Williams was to enter that plea, a reporter for a local television station published a story stating that he had been charged in a superseding indictment for violence at the Capitol. Fellow firefighters called him in anger. The story stayed up for about two hours before the reporter removed the false statement at his lawyer's demand. Facing two years in jail on the original charges, with his wife pregnant again, Mr. Williams pleaded guilty to the single count on November 2, 2021, in proceedings held by Zoom.

383. At sentencing the government asked that Mr. Williams be jailed for thirty days, which would have meant missing the birth of his second child. He submitted sixty-seven letters from people in his community, some of them former judges, attesting to his character. On February 9, 2022, Judge Friedrich sentenced him to two years of probation, sixty hours of community service, $500 in restitution, and a $10 special assessment. During his probation he could not possess firearms and had to report his travel to a probation officer. Mr. Williams and his mother paid about $40,000 in attorney's fees, $30,000 of it paid by his mother.

384. Mr. Williams spent well over a year and a half on unpaid leave. During that time he repeatedly emailed the department asking for the continuing-education courses he needed to keep his paramedic and firefighter certifications current, and never received a response. His

paramedic license lapsed. After his sentencing the department interviewed him and decided to fire him. His union contested the decision through every channel. At the final meeting with the city manager and the chief, he was told he was being fired and asked to be allowed to resign instead, and the city agreed. After losing his health insurance, he stopped using an insulin pump and began taking insulin injections. A fire department in Lake County, Florida, offered him a firefighter position by email after he told the chief about January 6, and withdrew the offer two hours later.

385. Lyft cancelled Mr. Williams's account on the ground that he was a danger to drivers and the public, and, to the best of his recollection, Airbnb removed him as well. Family members returning from overseas were detained and questioned about him: his stepbrother and his stepbrother's wife, who do not share his last name, were held for about forty-five minutes by customs officers on their return from Europe, and his brother's wife was held and questioned for about forty-five minutes on her return from Ireland while carrying her six-month-old baby. Upon information and belief, they were stopped because Mr. Williams had been placed on a government watch list.

386. Mr. Williams's mother and father, both realtors well known in their community, were humiliated, and his mother received a stream of harassing emails blaming her for how she had raised him. Some of his wife's relatives disowned him, and her brother said he deserved to be arrested. He received a handwritten letter mocking him as having gone "from zero to hero" and telling him he was going to federal prison. Mr. Williams identified the sender as a fraternity brother based on the New Orleans postmark, the writer's manner of expression, and a subsequent telephone conversation.

387. With his career gone and his family's savings running out, Mr. Williams and his wife sold their home in Florida and moved to Alabama in August 2024, where his wife works

remotely as a speech-language pathologist and he works as a home inspector paid a percentage of each job. His firearm license remains suspended.

388. Mr. Williams's prosecution terminated in his favor with the pardon of January 20, 2025. His DNA remains in the government's possession.

389. As a direct result of these malicious, selective, and vindictive prosecutions, each of the Plaintiffs suffered severe damages, including loss of liberty (incarceration or pretrial detention), loss of employment and income, emotional distress, reputational harm, legal defense costs exceeding hundreds of thousands of dollars, and ongoing collateral consequences.

390. The criminal proceedings have terminated in all the Plaintiffs' favor.

## CLAIMS FOR RELIEF

### Count I – Malicious Prosecution
### (FTCA: All the Plaintiffs Against United States)

391. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 390 above and incorporate them in this Count as though they are fully restated herein.

392. United States' employees (including all the officials described above) initiated criminal proceedings against all of the Plaintiffs.

393. The proceedings were initiated without probable cause.

394. The proceedings were continued with actual malice and for improper purposes (political persecution, retaliation, and deterrence of protected First Amendment activity).

395. The proceedings terminated in the Plaintiffs' favor.

396. The Plaintiffs suffered damages as a direct and proximate result.

397. The United States is liable under the FTCA for these torts committed by its investigative and law enforcement officers within the scope of their employment. 28 U.S.C. §

2680(h). The United States' officers and agents fabricated and exaggerated evidence, withheld exculpatory material, and pursued the cases despite the absence of probable cause that the Plaintiffs had committed the crimes alleged.

398. The criminal proceedings have terminated in the Plaintiffs' favor through acquittals, dismissals, and presidential pardons issued on January 20, 2025, which constitutes a favorable termination for purposes of a malicious-prosecution claim.

399. As a direct and proximate result of the Government's tortious conduct, each Plaintiff has suffered and continues to suffer damages in excess of $1 million, including but not limited to medical expenses, lost wages, pain and suffering, emotional distress, loss of liberty, loss of consortium, and other consequential damages.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiffs' property violated the Plaintiffs' constitutional and statutory rights pursuant to 28 U.S.C. § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper;

g. Order expungement of all records of criminal offenses; and



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

h. Order destruction of all DNA, blood, and other identifying biological information.

**<u>Count II – Selective Prosecution/Abuse of Process</u>**
**(FTCA – All Plaintiffs Against United States)**

400. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 390 above and incorporate them in this Count as though they are fully restated herein.

401. The United States used the legal process improperly (to wit: criminal prosecutions) in a manner that is not justified by the underlying legal action.

402. The United States had ulterior motives and used the legal system to harass, intimidate, coerce, and inflict emotional distress upon the Plaintiffs rather than to achieve a legitimate legal objective.

403. The Plaintiffs suffered harm as a result of the misuse of the legal process. This harm included economic injury, emotional distress, and other damages as described in this complaint.

404. The Defendant United States acted intentionally or with a reckless disregard for the consequences of its actions.

405. The prosecutions described in this complaint were selectively and vindictively initiated, maintained and pursued against the Plaintiffs because of the Plaintiffs' political affiliation, viewpoint, and association with the Trump candidacy or movement, while similarly situated individuals of opposing political views were not prosecuted. This constitutes selective and vindictive prosecution and abuse of process under District of Columbia common law and violates the Fifth Amendment's equal protection and due process guarantees.

406. As a result of the conduct of the United States' employees, the Plaintiffs have suffered emotional distress.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

407. The conduct of the above-named employees, including the police, prosecutors, judges, and prison officials, was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

408. The conduct of the United States' employees regarding each Plaintiff was such that it would arouse resentment against the United States in an average member of the community in which the conduct occurred and lead that person to exclaim, "Outrageous!"

409. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer, physical and mental injury, including, but not limited to, (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

410. The Plaintiffs suffered damages as a direct and proximate result.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiffs' property violated the Plaintiffs' constitutional and statutory rights pursuant to 28 U.S.C. § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper;

g. Order expungement of all records of criminal offenses; and

h. Order destruction of all DNA, blood, and other identifying biological information.

**<u>Count III - Federal Tort Claims Act – Negligence involving Personal Property</u>**
**(All Plaintiffs Against the United States of America)**

411. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 390 above and incorporate them in this Count as though they are fully restated herein.

412. The United States had a duty to exercise reasonable care in handling the Plaintiffs' seized property.

413. The FBI, an agency of the United States government, seized the Plaintiffs' personal property following the events of January 6.

414. The FBI seized cell phones, computers, mail and other items of property from the Plaintiffs.

415. The United States breached its duty by failing to exercise reasonable care in handling the Plaintiffs' property.

416. While in federal custody, the Plaintiffs' property was damaged, lost, or stolen.

417. The United States' breach of its duty caused damage to, loss of, or theft of the Plaintiffs' property.

418. As a direct and proximate result of the United States' breach of its duty, the Plaintiffs have suffered damages in the amounts to be established at trial.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiffs' property violated the Plaintiffs' constitutional and statutory rights pursuant to 28 U.S.C. § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper;

g. Order expungement of all records of criminal offenses; and

h. Order destruction of all DNA, blood, and other identifying biological information.

**<u>Count IV - Federal Tort Claims Act – Intentional Infliction of Emotional Distress</u>**
**(All Plaintiffs Against the United States of America)**

419. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 390 above and incorporate them in this Count as though they are fully restated herein.

420. The United States and its officers described in Paragraphs 1 through 390 engaged in extreme and outrageous conduct.

421. The United States' officers engaged in this conduct intentionally.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

422. The Plaintiffs each suffered public ridicule, mockery, and severe humiliation from being branded as insurrectionists, rioters, anti-American, seditionists, traitors, and violent individuals. The label "J6er" was besmirched and attached to the Plaintiffs with negative ramifications. The Plaintiffs have suffered emotional pain, loss of enjoyment of life, lost income, loss of choices in earning a living, and lost revenue from failed businesses and unobtainable employment as a result of this branding, imprisonment, and wrongful arrest.

423. The conduct of the conspirators was outrageous.

424. As a result of the conduct of the United States' employees, the Plaintiffs have suffered emotional distress.

425. The conduct of the above-named employees, including the police, prosecutors, judges, and prison officials, was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

426. The conduct of the United States' employees regarding each Plaintiff was such that it would arouse resentment against the United States in an average member of the community in which the conduct occurred and lead that person to exclaim, "Outrageous!"

427. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer, physical and mental injury, including, but not limited to, (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

428. The United States' conduct caused the Plaintiffs to have severe emotional distress.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

429. The Plaintiffs demand a trial to present evidence of such severe emotional distress.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiffs' property violated the Plaintiffs' constitutional and statutory rights pursuant to 28 U.S.C. § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper;

g. Order expungement of all records of criminal offenses; and

h. Order destruction of all DNA, blood, and other identifying biological information.

**Count V – Abuse of Process/Vindictive Prosecution**
**(FTCA – All Plaintiffs Against the United States)**

430. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 390 above and incorporate them in this Count as though they are fully restated herein.

431. The United States and its prosecutors retaliated against the Plaintiffs for defending themselves by filing vindictive, malicious, bogus superseding felony indictments or punishing them for exercising their constitutional rights.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

432. This was in accordance with a knowingly unconstitutional pattern and practice of the Garland Justice Department in J6 cases. The majority of J6ers who exercised their right to misdemeanor trials were similarly punished with false felony charges.

433. Word of this unconstitutional program and abuse of process spread widely among J6ers, compelling other accused J6ers to falsely plead guilty to crimes they didn’t commit.

434. The United States implemented or directed a policy, custom, or practice within the DOJ and U.S. Attorney’s Office for the District of Columbia, or failed adequately to train and supervise federal prosecutors in those offices, such that federal prosecutors were encouraged or permitted to file superseding indictments adding felony charges against January 6 Defendants who were initially charged only with misdemeanors and who refused to plead guilty and instead demanded their constitutional right to trial.

435. This policy constituted abuse of process and vindictive prosecution in violation of the Fifth Amendment’s Due Process Clause and was the moving force behind the unconstitutional actions against the Plaintiffs.

436. These false felony prosecutions were vindictively initiated and pursued against the majority of similarly situated J6 Defendants because they exercised their constitutional right to refuse a misdemeanor plea and demand a trial. Messrs. Garland and Graves, through unwritten policy, custom, directive, or deliberate indifference in training and supervision, caused federal prosecutors to file superseding false felony indictments in retaliation. Garland and Graves failed to properly train and supervise prosecutors regarding the prohibition on retaliatory charging decisions, despite the obvious risk of tortious and constitutional injury.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

437. In each case, the criminal proceeding terminated in the Plaintiffs' favor, either by dismissal, acquittal on key counts, or executive clemency that nullified the convictions and restored the Plaintiffs' rights.

438. The United States is liable under the FTCA for these torts (abuse of process and malicious prosecution) committed by its investigative and law enforcement officers within the scope of their employment. 28 U.S.C. § 2680(h).

439. In essence, this insidious practice deprived J6ers of their constitutional right to demand that allegations be subjected to fair adversarial trials.

440. As a result of the conduct of the United States' employees, the Plaintiffs have suffered emotional distress.

441. The conduct of the above-named employees, including the police, prosecutors, judges, and prison officials, was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

442. The conduct of the United States' employees regarding each Plaintiff was such that it would arouse resentment against the United States in an average member of the community in which the conduct occurred and lead that person to exclaim, "Outrageous!"

443. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer, physical and mental injury, including, but not limited to, (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

444. The Plaintiffs suffered damages as a direct and proximate result.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiffs' property violated the Plaintiffs' constitutional and statutory rights pursuant to 28 U.S.C. § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper;

g. Order expungement of all records of criminal offenses; and

h. Order destruction of all DNA, blood, and other identifying biological information.

**Count VI - Tortious Civil Conspiracy (under law of District of Columbia)**
**(All Plaintiffs versus the United States of America)**

445. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 390 above and incorporate them in this Count as though they are fully restated herein.

446. The United States and its officers described in Paragraphs 1 through 390 cooperated and reached a meeting of the minds between two or more of its officers to commit a wrongful act, and an overt act in furtherance, resulting in damages.

447. The United States is liable for the tortious conspiracy of its employees, including all branches of government, which resulted in the wrongful arrest, the wrongful imprisonment, the wrongful branding as criminals, insurrectionists, seditionists, traitors, impeding their rights by such labeling or by making records and including the Plaintiffs on lists which made it difficult to travel, to run a business, or to earn a living.

448. Wrongful acts by the United States include Malicious Prosecution, Abuse of Process, Intentional Infliction of Emotional Distress, and Trespass to Chattels.

449. Overt acts by United States officers include:

a. Brady violations and the withholding of exculpatory evidence on a mass scale.

b. Unlawful searches and seizures (and trespasses) based on bogus general "geofence warrants" whereby the government seized every cell phone number at the Capitol on January 6.

c. Falsifying evidence and falsely asserting that the Secret Service had restricted vast areas of the U.S. Capitol on January 6—while knowing the Secret Service had never imposed such restrictions.

d. Intentionally destroying, stealing, or breaking the property of J6ers, including that of the Plaintiffs.

e. The imposition of a bogus "obstruction of official proceedings" statute, knowing that the statute was never intended to apply to disorderly conduct by protestors.

f. The rigging of trials so that J6ers could not prevail.

g. The false placement of court venue in the courthouse where every judge in the courthouse was an interested witness to the events.

h. The burying of terabytes of discovery in databases which were inaccessible to the vast majority of J6ers.

i. The control and monitoring of defense attorneys' use of discovery databases.

j. The monitoring of attorney/client communications of J6ers.

k. The concealment of hundreds of undercover government operators and provocateurs among the crowds on January 6.

450. As a result of the conduct of the United States' employees, the Plaintiffs have suffered emotional distress.

451. The conduct of the above-named employees, including the police, prosecutors, judges, and prison officials, was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

452. The conduct of the United States' employees regarding each Plaintiff was such that it would arouse resentment against the United States in an average member of the community in which the conduct occurred and lead that person to exclaim, "Outrageous!"

453. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer, physical and mental injury, including, but not limited to, (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

454. The United States' conduct caused the Plaintiffs to have severe emotional distress.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

455. The Plaintiffs demand a trial to present evidence of such severe emotional distress.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiffs' property violated the Plaintiffs' constitutional and statutory rights pursuant to 28 U.S.C. § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper;

g. Order expungement of all records of criminal offenses; and

h. Order destruction of all DNA, blood, and other identifying biological information.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Respectfully submitted, Dated: November 11, 2026

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (954) 570-6757

_/s/ *Peter Ticktin*_________
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
Serv512@LegalBrains.com
ROGER ROOTS, ESQUIRE
Rhode Island Bar No. 6752
Serv517@LegalBrains.com